(99 P.3d 1125)
No. 91,619

CITY OF TOPEKA, *Appellee*, v. MOLLIE GRABAUSKAS, *Appellant*.

Opinion filed October 29, 2004.

*Keith Renner*, of Barnett & Renner, P.A., of Auburn, for appellant.

*Craig J. Spomer*, assistant city attorney, for appellee.

Before HILL, P.J., GREEN and MALONE, JJ.

GREEN, J.: Mollie Grabauskas was convicted of interference with an officer in the performance of his duty. Mollie appealed her municipal court conviction to the trial court. In a bench trial, the trial court affirmed Mollie's conviction. On appeal, Mollie contends that her seizure by police officers was illegal and that it violated her constitutional right to be free from an unreasonable search and seizure. We agree. We determine that the officers did not possess any reasonable, articulable suspicion to detain Mollie. In addition, Mollie maintains that her arrest was based on speech which was constitutionally protected. We agree and reverse.

One summer night in August, Mollie and her sister Naomi were walking down the street when they were stopped by the police. Officers York and Klumpp had received a description of two runaways earlier in their shift. One of the runaways (Amanda) was described as 14 years old, 5 feet, 6 inches tall, 130 pounds, long sandy blond hair which reached to her mid back, wearing a red

short-sleeved shirt and blue jean shorts, and riding a pink Huffy bicycle; Amanda's sister (Angela), also reported as a runaway, was described as 12 years old, 5 feet, 8 inches tall, 100 pounds, dark brown shoulder-length hair, wearing a blue, white, and gray horizontal striped shirt, and riding a purple Huffy bicycle. Mollie and her sister Naomi bore little resemblance to the runaway girls. Mollie was 22 years old, 5 feet tall, 110 pounds, dark brown shoulder-length hair fashioned in corn rows, and wearing a red shirt and blue jeans. She was not riding a bicycle. Naomi was 17 years old, 5 feet, 4 inches tall, dark brown hair just past shoulder length fashioned in a bun, and wearing a white shirt with black horizontal pin stripes and dark pants. She was not riding a bicycle either. The officers asked the young women whether they lived in the area. The young women indicated that they did live in the area, prompting the officers to ask for their names. Rather than answering the question, the women asked why the officers needed to know their names. York replied that they "needed to know for an investigation." Mollie replied, "We don't have to tell you shit. Stop harassing us. . . . We don't—We don't have to tell you shit. Leave us fucking alone."

The officers exited their patrol car. The young women responded by yelling. In response, the officers arrested the young women. A struggle ensued. Mollie squirmed and twisted away as York attempted to place her in handcuffs, and Naomi "charged" toward Klumpp. York eventually threw Mollie to the ground. During the struggle, Mollie's arm was broken.

Klumpp cited Mollie for interference with city officers and employees, a violation of Topeka City Code § 54-73 (2004). She was found guilty and ordered to pay a fine of $100 plus court costs. Mollie appealed her conviction to the trial court.

During the bench trial, both officers testified that when they first saw the young women, neither Mollie nor her sister made any furtive movements or tried to run from the officers. The officers also acknowledged that they did not witness the women committing any crime. When asked why the officers did not simply explain that they were looking for two runaway girls before asking for the

young women's names, York replied that the young women might have given false names if they were, indeed, the runaways sought.

The trial court found Mollie guilty of interference with city officers and employees and ordered her to pay court costs of $119.

Mollie maintains that her seizure by the police was illegal. The Fourth Amendment to the United States Constitution protects persons against unreasonable searches and seizures by the government. If the exchange between Mollie and the police was a seizure, the seizure is subject to the reasonableness requirement of both the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights. Our standard of review on this issue is a mixed question of law and fact. We give great deference to the trial court's findings of fact, but the ultimate conclusion of whether the stop was constitutionally permissible constitutes a legal question that requires independent appellate determination. *State v. Ludes*, 27 Kan. App. 2d 1030, 1032, 11 P.3d 72 (2000).

In summarizing the facts of this case, the trial court stated:

"All right, well, you have got a situation, a factual situation, in this case where you have got law enforcement officers who received information as to two runaway white females and the law enforcement officers are proceeding down a street and see two young white females walking on the sidewalk and they stop. And to this point it's really uncontroverted and the evidence is the same from all the witnesses that one of the officers asks, 'What's your name,' and there is, in essence, a refusal to comply with that request. And then the officers get out of the vehicle and the — by the defendant's evidence the refusal of cooperation with the law enforcement officers continues."

Concluding that the initial contact between the officers and Mollie and her sister involved an investigatory interrogation, the trial court stated:

"It seems to me this is an investigatory interrogation where — which is to be defined by the Kansas Supreme Court, defined as law enforcement officers in a routine manner and investigation which has not reached accusatory stage and persons not in custody are asked questions relating to their identification."

The trial court cited *State v. Taylor*, 231 Kan. 171, 642 P.2d 989 (1982), and *State v. Bohanan*, 220 Kan. 121, 551 P.2d 828 (1976), in support of its conclusions that the officers' questioning of Mollie was an investigatory interrogation. *Taylor* and *Bohanan* dealt with

whether police questioning of defendants Taylor and Bohanan constituted custodial interrogations requiring *Miranda* warnings. In both cases, our Supreme Court determined that the questioning of each defendant was an investigatory interrogation, which required no *Miranda* warnings. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him or her in custody. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). From the trial court's determination that this was an investigatory interrogation, it is apparent that the trial court considered the officers' initial encounter with Mollie and her sister as being free from restraint.

Determining that Mollie's interference occurred from the very inception of her encounter with the officers, the trial court stated: "It seems to me the interference took place in the very inception of the whole thing." Based on this interference, the trial court determined that the evidence was sufficient to find Mollie guilty of interfering with a city police officer in the performance of his or her duty.

Not all encounters between police officers and citizens involve "seizures" of persons within the meaning of the Fourth Amendment to the United States Constitution. See *Florida v. Royer,* 460 U.S. 491, 497, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). Generally, there are three types of police-citizen encounters: (1) an arrest supported by probable cause; (2) a *Terry* stop or temporary seizure of a person that must be supported by a reasonable and articulable suspicion of criminal activity; and (3) a voluntary encounter, which involves no restraint or coercion and therefore does not constitute a seizure. See *State v. Crowder,* 20 Kan. App. 2d 117, 119, 887 P.2d 698 (1994).

*Community Caretaking Function*

Although not mentioned by either party, there is another encounter commonly referred to as the community caretaking function. Community caretaking function is a phrase that describes police-citizen encounters that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the

violation of a criminal statute." *Cady v. Dombroski,* 413 U.S. 433, 441, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973).

Our Supreme Court favorably cited *Cady* in *State v. Vistuba,* 251 Kan. 821, 824, 840 P.2d 511 (1992). *Vistuba* involved an officer stopping a motorist after the officer saw him driving erratically. The officer believed that the driver was falling asleep. Finding that safety reasons alone may justify a vehicle stop, our Supreme Court stated that the stop of the motorist did not violate either the Fourth Amendment to the United States Constitution or Section 15 of the Kansas Constitution Bill of Rights. The court explained that because the stop was based on specific and articulable facts indicating that the motorist was falling asleep, the vehicle stop was proper.

In *State v. Ludes,* 27 Kan. App. 2d at 1035, our court determined that the community caretaking function announced in *Cady* was inapplicable to a vehicle stop in that case. Stating that *Cady* required a showing of exigent circumstances to support a community caretaking function, the *Ludes* court determined that exigent circumstances were lacking in the vehicle stop: "We do not find any exigent circumstances that would permit the interests of the State to override Ludes' right to be left alone." 27 Kan. App. 2d at 1035. Further, the *Ludes* court stated that the officer's actions in stopping Ludes did not fall within the area of community caretaking because the officer's primary reason for the stop was to investigate possible criminal activity. As a result, the officer's purpose in stopping the defendant was not totally divorced from detection, investigation, or acquisition of evidence, as required by *Cady.*

Our Supreme Court later cited *Cady* in *State v. Hamman,* 273 Kan. 89, 96, 41 P.3d 809 (2002). *Hamman* also involved a vehicle stop for safety reasons. Quoting from *State v. Vistuba,* 251 Kan. 821, the *Hamman* court reaffirmed the court's earlier holding in *Vistuba* that vehicle safety stops, when based on specific and articulable facts, do not violate the 14th Amendment to the United States Constitution or Section 15 of the Kansas Constitution Bill of Rights. It is apparent that our Supreme Court has adopted the community caretaking function exception announced in *Cady* in situations involving vehicle stops for safety reasons. Although we could not find a case similar to ours in which our Supreme Court

has applied the community caretaking function, we believe the court would extend the community caretaking function to this case.

The officers testified that they initiated the encounter with Mollie and her sister because they wanted to determine if they were the runaways that they had been told about earlier. Furnishing help or assistance through safety checks is a vital purpose of the community caretaking function. In this case, the officers' initial contact with Mollie and her sister would have fallen within the community caretaking function. The officers had no thought to Mollie and her sister being involved in any criminal activity. As a result, the officers' encounter with Mollie and her sister was completely "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 U.S. at 441. The encounter was reasonable and justified as a community caretaking function.

The City of Topeka (City) maintains that the officers had the right to detain Mollie and her sister as possible runaways under K.S.A. 38-1527(b). K.S.A. 38-1527(b) was designed to promote the public's interest in the safety of children who are potentially at risk. Under K.S.A. 38-1527(b),

"[a] law enforcement officer may take a child under 18 years of age into custody when the officer has probable cause to believe that the child is a child in need of care and there are reasonable grounds to believe that the circumstances and conditions of the child is such that continuing in the place or residence in which the child has been found or in the care and custody of the person who has care or custody of the child would be harmful to the child."

Nevertheless, the record does not justify detaining Mollie and her sister as possible runaways under K.S.A. 38-1527(b). As stated earlier, K.S.A. 38-1527(b) was designed to promote the public's interest in the safety of children. Nevertheless, when weighing the public's interest against an individual's substantial right to be free from police intrusions, courts must cautiously apply the community caretaking function. Under K.S.A. 38-1527(b), the officers could only detain Mollie and her sister if they had probable cause to believe that they were runaways. The officers lacked probable cause ("a fair probability") that Mollie and her sister were the runaways because they did not fit the description of the two runaways.

See *State v. Finley*, 17 Kan. App. 2d 246, 249-51, 838 P.2d 904, *rev. denied* 251 Kan. 940 (1992) (explaining the difference between reasonable suspicion and probable cause). As stated previously, Mollie and her sister bore little resemblance to the runaway girls. For example, Amanda, one of the runaways, was described as 14 years old, 5 feet, 6 inches tall, 130 pounds, long sandy blond hair which reached to her mid back, wearing a red short-sleeved shirt and blue jean shorts, and riding a pink Huffy bicycle. Amanda's sister Angela, also reported as a runaway, was described as 12 years old, 5 feet, 8 inches tall, 100 pounds, dark brown shoulder-length hair, wearing a blue, white, and gray horizontal striped shirt, and riding a purple Huffy bicycle.

On the other hand, Mollie was 22 years old, 5 feet tall, 110 pounds, dark brown shoulder-length hair fashioned in corn rows, and wearing a red shirt and blue jeans. She was not riding a bicycle. Naomi, Mollie's sister, was 17 years old, 5 feet, 4 inches tall, dark brown hair just past shoulder length fashioned in a bun, and wearing a white shirt with black horizontal pin stripes and dark pants. She was not riding a bicycle, either.

The officers' community caretaking functions should have ended when they saw that Mollie and her sister did not fit the descriptions of the runaways that they were looking for. Determining that the community caretaking function exception did not justify seizure of a 16-year-old minor, the Washington Supreme Court stated:

"The community caretaking function exception should be cautiously applied because of its potential for abuse. . . .

". . . Cautious application of the community caretaking function exception leads to our conclusion that the postseizure action by the officers against Petitioner was unreasonable. Respondent's interest in protecting the safety of children did not outweigh Petitioner's interest in her constitutional freedoms of association, expression and movement." *Washington v. Kinzy,* 141 Wash. 2d 373, 395-96, 5 P.3d 668 (2000).

In *Kinzy,* the police officers stated that they approached the juvenile because of their concern for her safety as a potential youth at risk. The juvenile walked away from the officers. The officers restrained her. During a pat-down search for weapons, the officers

discovered narcotics on the juvenile. The juvenile moved to suppress the narcotics. The trial court, however, denied the motion and found that the juvenile had committed the offense of possession of cocaine. The Washington Court of Appeals affirmed the decision of the trial court. On review, the Washington Supreme Court stated the officers preseizure encounter with the juvenile fell within the community caretaking function exception. Nevertheless, the court stated that because the officers had no articulable suspicion that the juvenile had committed a criminal offense, the juvenile was entitled to walk away and terminate the encounter with the police officers. The court further stated that when the juvenile chose to walk away from the two police officers and one of them grabbed the juvenile by the arm, this elevated the encounter to an unconstitutional seizure. The court pointed out that after the juvenile had been seized, the juvenile's "privacy interest in being free from police interference was no longer minimal. The officer was no longer permissively inquiring whether Petitioner would answer questions. Petitioner was compelled to answer questions to the satisfaction of the police officers." *Washington v. Kinzy*, 141 Wash. 2d at 395.

Under the circumstances, the *Kinzy* court determined that the seizure of the juvenile was unconstitutional and that the seizure had tainted all police activity which followed. Determining that the trial court should have granted the juvenile's motion to suppress evidence, the court reversed the decision.

Here, as in *Kinzy*, the officers' initial encounter with Mollie and her sister fell within the community caretaking exception. Nevertheless, once the officers saw that the characteristics of Mollie and her sister did not match the descriptions of the runaway juveniles, the officers' community caretaking function ceased. Under different circumstances, the officers might have been justified under K.S.A. 38-1527(b) in detaining the girls for a limited amount of time. For example, if the officers had stopped two girls who matched the description of the runaway girls and were in the area of town where the runaway girls were suspected to have gone, the officers might have been justified in ordering the girls to remain

in place until the parents of the suspected runaways could be contacted. This case, however, does not present such a situation.

*Voluntary Encounter*

Because the officers' community caretaking functions had ended, the continued contact between the officers and Mollie and her sister constituted a voluntary encounter where the girls could refuse to answer the officers' questions and simply walk away from the encounter if they so chose. In *State v. McKeown,* 249 Kan. 506, 509, 819 P.2d 644 (1991), our Supreme Court stated that an officer may approach an individual on the street and pose questions to the individual without "seizing" that person within the meaning of the Fourth Amendment. Nevertheless, the officer "cannot force the individual to answer." 249 Kan. at 509. Moreover, "[t]he individual is free to leave." 249 Kan. at 509. Quoting from *Florida v. Royer,* 460 U.S. at 497-98, the *McKeown* court stated that the officer may not detain the individual " 'even momentarily without reasonable, objective grounds for doing so.' " 249 Kan. at 509-10. Moreover, an individual's " 'refusal to listen or answer does not, without more, furnish those grounds.' " 249 Kan. at 509-10.

*Seizure*

The Fourth Amendment proscription against unreasonable seizures is implicated if an officer uses physical force or a show of authority in restraining an individual's freedom. In *State v. Morris,* 276 Kan. 11, 18-19, 72 P.3d 570 (2003), our Supreme Court stated: "[A] seizure of a person occurs if there is the application of physical force . . . or if there is a show of authority which, in view of all the circumstances surrounding the incident, would communicate to a reasonable person that he or she is not free to leave . . . ."

Like the juvenile in *Kinzy,* Mollie did not welcome the preseizure encounter with the police officers. Mollie vehemently protested the questioning by York and accused York of harassing her and her sister. York grabbed Mollie and attempted to place her in handcuffs. At this point, Mollie could not simply walk away after refusing to answer the officers' questions. We determine that the initial encounter between Mollie and the officers became a seizure

when York grabbed Mollie and attempted to place her in handcuffs. A reasonable person would believe that he or she was not free to leave if officers were attempting to place restraints on him or her. Under the existing circumstances, Mollie could not have reasonably believed that she was free to leave.

Moreover, the City does not dispute that Mollie was seized. The City implicitly concedes in its brief that the officers' encounter with Mollie and her sister escalated into a *Terry* stop, stating: "While being a runaway is not a crime in and of itself, an officer investigating such a status offense should have the same right to detain the supposed runaway and demand the information that *Terry* allows."

*Reasonable Articulable Suspicion*

For the seizure of Mollie to be constitutional under the Fourth Amendment, the officers must have had a reasonable, articulable suspicion that she had committed or was about to commit a crime. See *Terry v. Ohio,* 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). K.S.A. 22-2402 is a codification of *Terry.* See *State v. Field,* 252 Kan. 657, 659, 847 P.2d 1280 (1993). K.S.A. 22-2402(1) states:

"(1) Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions."

To support a reasonable suspicion, the officer must be able to articulate " ' " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." [Citation omitted.]' " *State v. Toothman,* 267 Kan. 412, 418, 985 P.2d 701 (1999) (quoting *State v. DeMarco,* 263 Kan. 727, 735, 952 P.2d 1276 [1998]). Reasonable suspicion must be formed before the seizure occurs. To determine whether reasonable suspicion exists, it is necessary to consider the totality of the circumstances. *United States v. Cortez,* 449 U.S. 411, 417, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981).

The possibility that Mollie was a runaway could not create a reasonable and articulable suspicion of criminal activity. The City concedes in its brief that the status of being a runaway is not a crime. Nor was there any evidence that Mollie had been or was

about to be engaged in criminal activity. Finally, Mollie's behavior in refusing to furnish the police officers with her name was not illegal. Under *McKeown,* she had the right to refuse to answer the officers' questions. Moreover, she had the right to walk away and terminate the encounter with the police officers. Based on the totality of the circumstances, we conclude that the officers did not possess any reasonable, articulable suspicion to detain Mollie. As a result, Mollie's detention was unlawful, and her conviction is reversed.

The City has submitted a letter of additional authority under Supreme Court Rule 6.09(b) (2003 Kan. Ct. R. Annot. 41). In the letter, the City points out a case recently decided by the United States Supreme Court: *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 159 L. Ed. 2d 292, 124 S. Ct. 2451 (2004). In *Hiibel,* the defendant was arrested and convicted for refusing to identify himself during a *Terry* stop in violation of Nevada's " 'stop and identify' " statute. This statute required a person detained by an officer during an investigative stop to identify himself or herself. Importantly, it was clear that the initial stop of defendant was based on reasonable suspicion. Defendant appealed, arguing that his conviction violated both the Fourth and the Fifth Amendments to the United States Constitution. Both the intermediate appellate court and the Nevada Supreme Court affirmed defendant's conviction. Certiorari was granted.

The United States Supreme Court held that the Nevada statute's requirement that a suspect must disclose his or her name in the course of a *Terry* stop did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures. 542 U.S. at 186. In doing so, the Court declared that obtaining a suspect's name during a *Terry* stop served important government interests. For instance, knowledge of identity may bring to light that the suspect is wanted for other offenses or that he or she has a record of violence or a mental disorder. Conversely, learning the suspect's identity may clear him or her and allow officers to concentrate their efforts elsewhere. 542 U.S. at 186. The Court determined that the Nevada statute properly balanced the intrusion on an individual's Fourth Amendment interests against the promotion of legitimate

government interests. The Court explained: "The request for identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop. The threat of criminal sanction helps ensure that the request for identity does not become a legal nullity." 542 U.S. at 188.

Here, in her response to the City's Rule 6.09 letter, Mollie contends that *Hiibel* is not helpful to the present inquiry, as *Hiibel* involved a situation in which the initial stop of defendant was based on reasonable suspicion. The officers in this case testified that they did not suspect Mollie of committing a crime; rather, they simply suspected her of being a runaway. As stated previously, the status of being a runaway is not a crime. Unlike the State of Nevada, we have no statute requiring persons to identify themselves in voluntary stops involving the police. *Hiibel* is clearly distinguishable from this case.

*Speech*

Next, Mollie maintains that her verbal criticism and challenge directed at the police officers formed the basis for the criminal charge against her. As a result, Mollie argues that her verbal criticism and exchange were constitutionally protected and that the Topeka City Code § 54-73 could not apply. The Code states: "It shall be unlawful for any person to knowingly or unknowingly interfere with any city officer or employee in the performance of duty for the city."

In support of her position, Mollie primarily relies on *Houston v. Hill*, 482 U.S. 451, 96 L. Ed. 2d 398, 107 S. Ct. 2502 (1987). In *Hill*, the defendant was arrested for statements he made in violation of a Houston ordinance. The ordinance made it a criminal offense to interfere with an officer in the line of duty. The *Hill* court stated: "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 461-63.

On the other hand, the City maintains that Mollie was arrested because she refused to furnish her name to the police officers. The City insists that Mollie was not arrested based on her verbal criticism of the officers. Moreover, both officers testified that Mollie did not commit any crime by directing verbal obscenities at them. Nevertheless, in finding Mollie guilty of interfering with a city officer, the trial court stated:

"Well, it seems to me that's exactly what happened here. Have two law enforcement officers who were trying to find out whether these people, these individuals, are the persons that they are looking for. . . .

". . . It seems to me the interference took place in the very inception of the whole thing . . . ."

If the interference occurred at the very inception of Mollie's encounter with the police, Mollie's verbal criticism and challenge directed at the officers formed a basis for the interference charge.

The case of *Duran v. City of Douglas*, Ariz., 904 F.2d 1372 (9th Cir. 1990), offers some support for Mollie's position. The defendant in Duran was arrested for disorderly conduct after he had made obscene gestures and yelled profanities at a police officer. In stating that the defendant's verbal statements were constitutionally protected, the *Duran* court stated:

"Inarticulate and crude as Duran's conduct may have been, it represented an expression of disapproval toward a police officer with whom he had just had a run-in. As such, it fell squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech—such as stopping or hassling the speaker—is categorically prohibited by the Constitution." *Duran,* 904 F.2d at 1378.

Here, when Mollie asked the police officers why they wanted to know her name, it represented an expression of disapproval toward the officers. As such, Mollie's criticism and challenge directed at the officers were protected under the First Amendment.

In stating that there are limits on what police officers may do in discharging their duties, the *Duran* court declared: "Thus, while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not

merely lawful, but protected by the First Amendment." *Duran*, 904 F.2d at 1378.

Finally, the First Amendment does not prevent enforcement of Topeka City Code § 54-73 when it is not applied to curb protected speech. Here, because Mollie's speech was protected, § 54-73 could not be used to curb such speech.

Reversed.