No. 117,559

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTIAN BLAKE MESSNER,
*Appellant*.

SYLLABUS BY THE COURT

1.

Kansas courts recognize that police may conduct a public safety, or community caretaking, stop in certain circumstances. Such a stop does not require the police to have reasonable suspicion of a civil or criminal infraction. But the stop must be based upon specific and articulable facts.

2.

A public safety or community caretaking stop must be divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

3.

As a general rule, matters not raised before the district court cannot be raised for the first time on appeal. Although there are some exceptions to this rule, the party seeking to raise a matter for the first time on appeal must invoke one of the exceptions and explain in briefing why the issue is properly before the court. Kansas Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34).

1

4.

Kansas Supreme Court Rule 6.02(a)(5) is not simply a "gotcha" from the Kansas appellate courts. The rule encourages litigants to fully present their cases to the trial court. All issues and claims are then tested by the adversarial process further refining and defining the facts and law in dispute and insuring fundamental fairness in the proceeding.

Appeal from Butler District Court; CHARLES M. HART, judge. Opinion filed May 18, 2018. Reversed and remanded with directions.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Brett D. Sweeney*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and HEBERT, S.J.

ARNOLD-BURGER, C.J.:  Kansas courts recognize that police may conduct a public safety, or community caretaking, stop in certain circumstances. *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511 (1992), *disapproved in part on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). Such a stop does not require the police to have reasonable suspicion of a civil or criminal infraction. 251 Kan. at 824. However, a safety stop must be "'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 214-15, 99 P.3d 1125 (2004) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 [1973]).

In this case, Christian Blake Messner was stopped by police in response to a concern expressed by employees at the local Dillons store concerning his behavior and length of stay in the store. When Messner left the store in a vehicle, police followed him for the sole purpose of checking his welfare. Upon stopping him police did little to check his welfare, but instead seized his driver's license and checked for any warrants. After

learning he had a warrant out for his arrest, police arrested Messner and subsequently searched his car. Messner moved to suppress the evidence, arguing that the arrest and search were unlawful. The district court disagreed and denied Messner's motion. Because we find that the officer exceeded the scope of the public safety or welfare stop, we reverse the district court's denial of the motion to suppress and remand the case with directions.

FACTUAL AND PROCEDURAL HISTORY

Messner was in a Dillons store in Andover, Kansas, from around 10:15 p.m. on a Tuesday evening to 6 a.m. Wednesday morning—almost eight hours. When Sally Hermann arrived for her shift at the store, employees informed her that Messner had been in the store all night and they were concerned about his behavior. Messner would "just stand and stare" at walls and people. According to Hermann, it seemed like Messner did not know what he was staring at. Messner was also picking at his skin.

Hermann and a couple of male employees approached Messner to see if he was alright. Hermann noticed that Messner was wearing a coat sold in the store with the tag still on it. Messner asked Hermann, "'Do you know where my coat is?'" Hermann told him that she did not know where his coat was. Hermann described Messner as confused as to where he was located. When asked if there was anyone with him, Messner said that he did not think so. Hermann told Messner that if he was not going to purchase anything he needed to leave.

Messner took off the Dillons jacket and began to leave the store. Hermann called the police to let them know that Messner had been at Dillons for eight hours and that his behavior should be followed up. A dispatch went out to "check the welfare of an individual that had been in Dillons for quite a while." Sergeant/K-9 Officer Mickey Farris arrived. He immediately encountered Hermann who was standing at the door pointing at

3

a white vehicle that was pulling away. Sergeant Farris indicated that Hermann said, "'That's the individual. Um, he's in no shape to drive.'" Hermann also told him that she thought Messner was "meth'd out due to all the sores on him."

Based solely on Hermann's comments, Sergeant Farris got in his vehicle and followed Messner for about 1 mile and during that time did not notice Messner commit any traffic infractions. Based on his observations, Sergeant Farris did not have any concerns about Messner's ability to drive. He went so far as to say that he was concerned about stopping Messner's vehicle because he "would have liked to have had a . . . traffic infraction." Sergeant Farris contacted his supervisor and asked whether he should stop Messner's vehicle. The supervisor, who had been listening to the call on his radio, told Sergeant Farris to pull over Messner to "check his welfare" make sure "that everything is all right with him."

Sergeant Farris pulled over Messner. Sergeant Farris asked Messner about his behavior at Dillons. Messner indicated that he had been left at Dillons "and done wrong" and he was waiting for a ride. Sergeant Farris thought this was odd because Messner drove a car away from Dillons. Sergeant Farris also noticed that Messner's speech and movement was slow. Sergeant Farris acknowledged that he did not know whether Messner's speech was normally slow. After speaking with Messner, Sergeant Farris felt that Messner was not in a condition to drive. When asked why he didn't proceed with a DUI investigation, Sergeant Farris noted that although he thought "something wasn't right" he didn't smell any alcohol. He speculated that it could have simply been a medical condition. He did nothing to determine what may be wrong.

Instead, Sergeant Farris asked for Messner's driver's license to run a check on Messner for "wants and warrants." Between Sergeant Farris' first contact with Messner and the time it took to request Messner's license a couple of minutes had passed. Sergeant Farris learned that Messner had a suspended driver's license and a warrant from Wichita,

4

Kansas. Sergeant Farris handcuffed Messner and placed him in the back of the patrol vehicle. While waiting for more information from Wichita, Sergeant Farris chose to take his service dog around Messner's vehicle for a drug sniff.

Sergeant Farris testified that he and his dog were certified through the Kansas Police Dog Association. He also testified that they recertified every spring. Further, Sergeant Farris and his dog had never failed to be certified.

Sergeant Farris' dog alerted to Messner's vehicle and Farris searched the vehicle. Sergeant Farris located a black bag with a hypodermic needle and two spoons with methamphetamine on them.

Messner was charged with possession of methamphetamine, possession of paraphernalia, and driving while suspended. Messner moved to suppress the evidence of the stop, arguing that his rights under the Fourth Amendment to the United States Constitution were violated. A suppression hearing was held where the above facts were presented. After hearing the evidence, the district court denied the motion to suppress. The court held that the stop was initiated because Sergeant Farris was concerned about Messner's, and the public's, welfare. Further, the court held that in this particular case Sergeant Farris continued acting as a community caretaker by determining, through a wants and warrants check, whether Messner was licensed to drive.

After the suppression hearing, a bench trial on stipulated facts occurred. The district court found Messner guilty as charged based on the stipulated facts. Messner timely appeals.

ANALYSIS

On appeal, Messner first argues that Sergeant Farris did not have specific and articulable facts to support a public safety stop. Messner then argues, in the alternative,

5

that even if a public safety stop was justified, Sergeant Farris exceeded the proper scope of such a stop. If Messner is correct, and no exception applies, then the evidence from the stop must be suppressed. See *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

*Standard of Review*

When, as here, the material facts to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016).

*The officer exceeded the scope of a public safety stop by seizing Messner's driver's license and checking for warrants.*

The United States Constitution provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Further, the Kansas Constitution provides similar protection, stating:  "The right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate." Kan. Const. Bill of Rights, § 15. A traffic stop is considered a seizure. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).

Kansas courts recognize that police may lawfully conduct a safety stop in certain situations. *State v. Gonzales*, 36 Kan. App. 2d 446, 451, 141 P.3d 501 (2006). For a safety stop to be justified, the stop must be based upon specific and articulable facts. *Vistuba*, 251 Kan. at 824. A safety stop does not require a civil or criminal infraction to occur. 251 Kan. at 824.

6

Messner argues that the stop itself was not a safety stop and instead needed to be supported by facts and inferences that a criminal activity occurred. However, the district court found that this was a public safety stop. We find that the evidence supports such a finding. Sergeant Farris was aware that Messner had been in Dillons for "quite a while." Store personnel told Sergeant Farris that she thought Messner was "meth'd out due to all the sores on him" and that he should not be driving. Under these facts the district court did not err in finding that the stop was a public safety stop to check the welfare of Messner. See *Gonzales*, 36 Kan. App. 2d at 454 (deferring to district court that specific and articulable facts supported safety stop); see also *State v. Slater*, 267 Kan. 694, 700-01, 986 P.2d 1038 (1999) (noting, in the criminal context, tips from identifiable sources are highly reliable). But see *State v. Marx*, 289 Kan. 657, 663, 215 P.3d 601 (2009) (noting assertion of safety stop was belied by officer following vehicle for a mile in the hope of observing a traffic infraction). However, that does not resolve the case.

Situations involving safety stops should be scrutinized carefully to ensure "the protections of the Fourth Amendment are not emasculated." *Gonzales*, 36 Kan. App. 2d at 455. To determine whether a safety stop runs afoul of the Fourth Amendment's protections Kansas courts employ a three-part test. *State v. Morales*, 52 Kan. App. 2d 179, 182-83, 363 P.3d 1133 (2015).

First, the officer must have "objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen is in need of help or is in peril." 52 Kan. App. 2d at 182. The stop must be "'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *City of Topeka*, 33 Kan. App. 2d at 214-15. "Second, the officer may take appropriate action to render assistance if the citizen is in need of aid." *Morales*, 52 Kan. App. 2d at 182. Third, if the officer determines that the citizen is not in need of help, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment. 52 Kan. App. 2d at 183.

7

As stated above, under the first prong Sergeant Farris had objective, specific, and articulable facts which supported making a public safety stop. While Sergeant Farris may not have seen Messner commit any traffic infractions, he was aware that Messner was behaving strangely and that Hermann, an identified witness—as opposed to an anonymous tipster—thought he was not fit to drive. Messner also argues that Sergeant Farris did not have any fear for public safety because after stopping Messner he did nothing, such as field sobriety testing, to determine if Messner was unfit to drive. However, given that safety stops should be "'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute'" this is unsurprising. See *City of Topeka*, 33 Kan. App. 2d at 214-15. Instead, Sergeant Farris stated unequivocally that he spoke with Messner to make sure he was alright.

As to the second factor, when a valid safety stop is made, the officer can take appropriate action to render assistance if the individual is in need of aid. *Morales*, 52 Kan. App. 2d at 182. Here, the officer made some initial observations about Messner when he spoke with him. Sergeant Farris indicated that Messner's speech and movement were slow and that he seemed confused. According to Sergeant Farris this made him feel that Messner was not in a condition to drive. But because he could not smell alcohol, Sergeant Farris testified that he could not rule out that Messner's behavior may have been due to a medical condition. He also indicated that he did not know whether Messner's slow speech was out of character for Messner. He testified that he had no reason to believe at that point that any crime had been committed. Sergeant Farris continued to characterize the stop as solely a welfare check stop. He did not do any further testing of Messner's condition; instead, he asked for Messner's driver's license in order to run a warrant check.

Based on the third and final factor, if the officer determines that the citizen is not in need of help, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment. *Morales*, 52 Kan. App. 2d at 183. The officer cannot

go further than checking on the individual's welfare. In *Gonzales*, this court held that the officer exceeded the scope of the safety stop by asking about ownership of the vehicle in question and demanding and retaining the individuals' driver's licenses. 36 Kan. App. 2d at 457. Because of the similarities between *Gonzales* and this case, we will examine it in more detail.

In *Gonzales*, two individuals were pulled over because their rear tire was bouncing around a little bit. Prior to pulling the individuals over the officer had not noticed any illegal activity. The officer informed the individuals the reason they were pulled over, and then asked for the individuals' licenses and registration; he also asked where they were going. The officer also requested a warrant check on the individuals. The officer examined the tire while the warrant check was occurring. After the warrant check information was obtained, the officer returned the individuals' licenses and told them they were free to leave; but in the same breath he said he had additional questions. Eventually, the officer searched the vehicle and located drugs.

On appeal, this court held that the officer exceeded the scope of the safety stop because the officer was "limited to an examination of the tire to determine if it was safe to continue driving and to alert the driver about the condition of the tire." 36 Kan. App. 2d at 457. The court noted that allowing "law enforcement officers to cite a safety issue and then permit a full investigation as would take place during a stop for a traffic infraction would effectively eliminate all protections of the Fourth Amendment." 36 Kan. App. 2d at 458.

Like in *Gonzales*, Sergeant Farris exceeded the limitations of the safety stop when he did more than speak with Messner to determine whether he was alright to drive. See 36 Kan. App. 2d at 457-58. Taking Messner's driver's license and returning to his vehicle to run a warrant check runs afoul of the rule that a safety check should be "'totally divorced from the detection, investigation, or acquisition of evidence relating to the

9

violation of a criminal statute.'" *City of Topeka*, 33 Kan. App. 2d at 214-15. Obtaining Messner's license did not advance the safety stop. Running a check for warrants did not help Sergeant Farris determine whether Messner was in a condition to drive at that time. Sergeant Farris followed Messner for a mile and did not notice any problems with Messner's ability to drive and after speaking with Messner only noted that he had slow speech and movement and he seemed confused. Neither slow speech nor confusion are enough to overcome the fact that Messner appeared to be driving fine. Sergeant Farris gave no other reason for obtaining Messner's driver's license than to run it for wants and warrants. Even if it was reasonable to ask for identification to see who he was talking to, there was nothing related to viewing Messner's driver's license and obtaining his name that would cause suspicion. Instead, Sergeant Farris exceeded the scope of the safety stop by actually seizing Messner's driver's license and checking for warrants. See *Gonzales*, 36 Kan. App. 2d at 458.

*There was not sufficient reasonable suspicion to conduct an investigative detention.*

The State argues, in the alternative, that Sergeant Farris could stop Messner as part of an investigation based on Hermann's tip.

The State relies on the United States Supreme Court case *Navarette v. California*, 572 U.S. __, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014), to support its argument. In *Navarette*, the Court held that anonymous tips, in some situations, can serve to provide an officer with reasonable suspicion to perform an investigatory stop. 134 S. Ct. at 1692. In *Navarette*, an anonymous 911 caller informed police that a truck had run her off the road. The caller provided specific details about the truck, including its license plate number. Police located the truck and pulled it over, leading to the driver being arrested. The Court noted that anonymous tips can give sufficient information to provide reasonable suspicion when the tipster claims eyewitness knowledge and the tip was provided contemporaneously to the alleged criminal conduct. 134 S. Ct. at 1689. The Court also

10

noted that even a reliable tip only justifies an investigative stop if it creates reasonable suspicion that "'criminal activity may be afoot.'" 134 S. Ct. at 1690 (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]). The Court held that the information the vehicle had run the tipster off the road was sufficient to provide reasonable suspicion of driving under the influence. 134 S. Ct. at 1690-91. The Court also noted that the tipster had done more than provide a "conclusory allegation of drunk or reckless driving." 134 S. Ct. at 1691. Finally, the Court also held that the absence of additional suspicious conduct, after the vehicle was spotted by police, did not remove the reasonable suspicion that the driver was intoxicated. 134 S. Ct. at 1691.

On the facts of this case, the State's argument is unpersuasive. Hermann's tip, although clearly not anonymous, was not enough to provide reasonable suspicion that a crime was occurring. Hermann told Sergeant Farris that Messner had been in the store all night and that he appeared confused. She also told him that Messner was "meth'd out." But she qualified this by saying she came to this conclusion because he had sores on his body, not his behavior. Finally, she concluded that he was "'in no shape to drive.'" However, those statements are merely conclusory statements that are not enough to support a finding of reasonable suspicion to conduct an investigatory stop. See 134 S. Ct. at 1691. Further, because Sergeant Farris did not have reasonable suspicion that Messner was unfit to drive based on Hermann's tip, his observation of Messner's driving without any problem counts against him. See 134 S. Ct. at 1691 (noting that absence of further suspicious conduct does not dispel *already existing* reasonable suspicion). Sergeant Farris was unable to corroborate Hermann's statement, anonymous or otherwise, that Messner was not fit to drive. See *State v. Chapman*, 305 Kan. 365, 373-74, 381 P.3d 458 (2016) (noting that anonymous tips often require some corroboration by law enforcement).

Finally, Sergeant Farris' conversation with Messner where Messner spoke and moved slowly and appeared confused was not enough to provide reasonable suspicion allowing the public safety stop to morph into an investigatory stop. The State argues that

11

under *Nickelson v. Kansas Dept. of Revenue*, 33 Kan. App. 2d 359, 102 P.3d 490 (2004), the initial public safety stop could properly extend into an investigatory stop. In *Nickelson*, this court held a public safety stop can properly extend into an investigatory stop when facts exist to support further investigation. 33 Kan. App. 2d at 367. In *Nickelson*, an officer was checking on a car that was parked on the side of the road early in the morning where there was no discernable reason to be stopped. Upon approaching the vehicle, the officer immediately smelled alcohol coming from the vehicle. This court held that because the officer immediately smelled the strong odor of alcohol coming from the vehicle the stop properly morphed from a safety stop to an investigative stop. 33 Kan. App. 2d at 367.

This case is distinguishable from *Nickelson*, because Sergeant Farris did not get any real indication that Messner was unfit to drive. See 33 Kan. App. 2d at 360-61. Sergeant Farris did not smell any alcohol. Messner spoke and moved slowly and seemed confused, but that alone does not amount to reasonable suspicion that he was driving impaired. In fact, Sergeant Farris clearly testified that he had no reason to believe that any crime had been committed even up to the point he asked for Messner's driver's license. The State must live with the testimony as it was presented, not as it would like it to be.

Because there was no justifiable basis for the investigation after the safety stop occurred, the search of the car was an illegal search. Therefore, the district court erred in finding that the stop properly shifted from a safety stop to a justifiable investigatory stop.

*The State has abandoned its new argument on appeal that the attenuation doctrine applies here by not properly briefing it.*

In a final attempt to justify the stop, for the first time on appeal, the State argues the existence of a "preexisting and untainted arrest warrant" would allow the evidence to be admissible.

"As a general rule, matters not raised before the district court cannot be raised for the first time on appeal." *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). Kansas courts, however, recognize three exceptions to this rule. *State v. Jones*, 302 Kan. 111, 117, 351 P.3d 1228 (2015).

"A new legal theory may be asserted for the first time on appeal if: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent a denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite relying on the wrong ground or assigning a wrong reason for its decision." 302 Kan. at 117.

But an exception must be invoked by the party asserting the claim for the first time on appeal. Kansas Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 35), describing the required contents of an appellant's brief, clearly states those briefs must include:

"The arguments and authorities relied on, separated by issue if there is more than one. Each issue must begin with citation to the appropriate standard of appellate review and a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. *If the issue was not raised below, there must be an explanation why the issue is properly before the court.*" (Emphasis added.)

13

Our Supreme Court continues to reiterate that Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). That peril includes a ruling that an issue improperly briefed will be deemed waived or abandoned. 298 Kan. at 1085. The direction of the Supreme Court could not be any clearer. "[L]itigants have no excuse for noncompliance with Rule 6.02(a)(5)." *Godfrey*, 301 Kan. at 1044.

This rule is not simply a "gotcha" from the appellate courts. The rule encourages litigants to fully present their cases to the trial court. All issues and claims are then tested by the adversarial process further refining and defining the facts and law in dispute. How can the district judge be expected to make a decision in consideration of arguments that are not brought before him or her? The rule also insures fundamental fairness in the proceeding. Parties deserve the opportunity to respond to all arguments made and present evidence to support their respective positions. If litigants can raise a matter for the first time on appeal, they would be free to, in essence, readjudicate the matter merely because they forgot to raise everything they wanted to before the trial court or second-guessed their tactical decisions at trial once they started preparing their appellate brief. Just as we do not expect trial courts to support trial by ambush, neither should we tolerate the same on appeal. An appellant is not "permitted to feed one can of worms to the trial judge and another to the appellate court." *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976), *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010). Supreme Court Rule 6.02(a)(5) provides the incentive to prevent such tactics.

Because the State failed to explain why this issue is properly before the court for the first time on appeal, we deem the argument to be abandoned.

In sum, because we find that Sergeant Farris exceeded the scope of the public safety stop by seizing Messner's driver's license and running it for wants and warrants,

14

the court erred in denying his motion to suppress. We need not reach the other issue raised by Messner concerning the dog sniff evidence.

Reversed and remanded with directions to grant Messner's motion to suppress.