No. 119,431

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TIA RENEE MCKENNA,
*Appellant*.

SYLLABUS BY THE COURT

1.

An officer does not exceed the scope of a public safety stop, under the circumstances of this case, by asking for a person's name, getting a verbal response, and checking that name locally for warrants.

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed January 31, 2020. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Andrew R. Davidson*, assistant district attorney, *Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., GARDNER, J., and MCANANY, S.J.

GARDNER, J.: After the State charged Tia McKenna with possession of methamphetamine and possession of a stimulant, McKenna moved to suppress evidence of the drugs. She argued that the arresting officer unconstitutionally detained her without reasonable suspicion that she was committing a crime. The district court disagreed,

1

finding that the officer conducted a valid public safety stop. It denied the suppression motion and then found McKenna guilty as charged. McKenna appeals only the district court's denial of her suppression motion. We find that the officer's contact with McKenna was a valid public safety stop and did not exceed its bounds; thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2017, around 2 a.m., Officer Daniel Styles of the Hutchinson Police Department was driving his police vehicle on patrol. In a residential neighborhood, he came upon a car legally parked on a dark street with its dome light on. The vehicle's driver-side window was down, and a woman, McKenna, was sitting in the driver's seat with her face tilted away from the street. She appeared to be asleep or unconscious. Styles shined his spotlight on the driver but she did not respond. By the way she was slumped over, Styles suspected that she was intoxicated so he turned his patrol car around and parked behind her car. He activated his rear emergency lights—which can be seen only from behind his patrol car—but used his front headlights to illuminate her car.

Styles walked up to the driver's door, stood outside its open window, shined his flashlight into the car, knocked on its roof, and called the woman to rouse her. After a while, she began to wake up. Styles identified himself as an officer, asked if the driver knew where she was, and asked her name. She did not answer clearly. Styles also asked if she had any identification or if she had been drinking. When the driver continued to be unresponsive, Styles reached through the open window and nudged her arm, saying "come on, I need you to get up now." When she stirred, Styles again asked what her name was, where she stayed, and whether she knew where she was. The driver, after much prompting, responded that her name was Tia McKenna. Styles asked her these questions because he was concerned for her well-being and, if she were intoxicated, wanted to give her a ride home rather than allow her to drive.

2

After learning her name, Styles asked dispatch to "check the in-house" for a Tia McKenna. Two minutes later, dispatch informed him that McKenna had an outstanding warrant for her arrest. Styles then arrested McKenna based on that warrant.

Styles took McKenna to the county jail. During intake, law enforcement found a bag containing methamphetamine and a bag containing Alprazolam, commonly known as Xanax, in McKenna's bra.

After the State charged McKenna with possession of methamphetamine and possession of a stimulant, she moved to suppress the evidence. Styles was the sole witness at the hearing, and the State admitted the video and audiotape he had made of his encounter with McKenna. The district court denied McKenna's motion, finding Styles was acting in a community caretaking function and did nothing wrong. After a bench trial on stipulated facts, the district court convicted McKenna as charged. The district court sentenced McKenna to a 20-month prison sentence and granted her probation.

McKenna timely appeals.

## DID THE DISTRICT COURT ERR BY DENYING MCKENNA'S MOTION TO SUPPRESS EVIDENCE?

McKenna argues the district court should have granted her motion to suppress because Styles violated her Fourth Amendment rights against unreasonable seizure. She argues that (1) Styles seized her under the meaning of the Fourth Amendment to the United States Constitution, (2) he did not have reasonable suspicion of criminal activity to initiate this seizure, and (3) the attenuation doctrine should not apply. See *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2062, 195 L. Ed. 2d 400 (2016) (holding that officer's discovery of valid, preexisting arrest warrant attenuated connection between unlawful investigatory stop and drug-related evidence seized from defendant during

3

search incident to arrest). In response, the State argues that Styles' contact with McKenna was justified as a welfare check, but if Styles unconstitutionally seized McKenna, the attenuation doctrine applies.

McKenna filed no reply brief. But during oral argument, counsel for McKenna argued that any public safety stop exceeded its lawful scope when the officer asked for McKenna's name and ran a warrants check. We invited the parties to address that issue if they desired, and they have. We consider their supplemental filings, as well as the oral arguments by counsel, because they expound upon issues previously briefed.

*Standard of Review*

When the material facts supporting a district court's decision on a motion to suppress evidence are undisputed, as here, the ultimate question whether to suppress is a question of law over which we have unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

*Analysis*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourteenth Amendment incorporates these provisions to the states. See *Mapp v. Ohio*, 367 U.S. 643, 655-60, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). Section 15 of the Kansas Constitution Bill of Rights contains similar language and provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). "The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973).

4

Kansas courts have recognized four types of police-citizen encounters: (1) voluntary encounters, (2) investigatory detentions, (3) public safety stops, and (4) arrests. *State v. Phillips*, 49 Kan. App. 2d 775, 783, 315 P.3d 887 (2014). The encounter at issue here is the public safety stop, or welfare check. Generally, to properly detain an individual in a public place for an investigatory detention—*i.e.*, a *Terry* stop—an officer must have a reasonable suspicion that a person is committing, has committed, or is about to commit a crime. See K.S.A. 22-2402(1); *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). But the State does not contend that the officer reasonably suspected McKenna of a crime.

Instead, the State relies on the public safety rationale, first enunciated by the United States Supreme Court in *Cady*, and recognized by the Kansas Supreme Court in *State v. Vistuba*, 251 Kan. 821, 840 P.2d 511 (1992), *disapproved in part on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). That doctrine is based on the idea that the role of police is not limited to the detection, investigation, and prevention of criminal activity. Rather, police officers engage in many activities that ensure people's safety and welfare. Requiring reasonable suspicion of criminal activity before police can investigate and give aid in these situations would hamstring their ability to protect and serve the public.

The district court found that the encounter between McKenna and Styles was a valid public safety stop. A public safety stop "does not require the police to have reasonable suspicion of a civil or criminal infraction." *State v. Messner*, 55 Kan. App. 2d 630, Syl. ¶ 1, 419 P.3d 642 (2018). However, a safety stop must be ""'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"" 55 Kan. App. 2d at 631. "[A]s with any other police encounter, the scope of the detention during a public safety stop cannot exceed the justifications for the stop." *State v. Gonzales*, 36 Kan. App. 2d 446, 455, 141 P.3d 501 (2006). In applying the public safety rationale to justify a police-citizen encounter, courts carefully scrutinize the facts

5

"so the protections of the Fourth Amendment are not emasculated." 36 Kan. App. 2d at 455.

The *Gonzales* court adopted a three-part test to determine the legality of a public safety stop. First, as long as there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate. Second, if the citizen needs aid, the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment. 36 Kan. App. 2d at 456. We use that test here. See *State v. Morales*, 52 Kan. App. 2d 179, 182-83, 363 P.3d 1133 (2015).

First, the record contains objective, specific, and articulable facts from which a law enforcement officer would have suspected that McKenna needed help. She was slumped over in a car, with her window rolled down and the car's dome light on, at 2 a.m. in a high drug trafficking area. And when the officer shined a spotlight at McKenna, she did not respond in any way. These are the factors Styles noted which made him concerned that McKenna either needed medical attention or was intoxicated and may try to drive while impaired, endangering herself and the public. These facts justified his initial investigation, as McKenna seems to concede. See *Nickelson v. Kansas Dep't. of Revenue*, 33 Kan. App. 2d 359, 365, 102 P.3d 490 (2004) (holding the public safety stop was valid where officer checked on a vehicle that had pulled into "the middle of nowhere"); see also *Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007) (holding officer's initial interaction with sleeping passenger was valid under the community caretaking function, using same test as Kansas).

Second, McKenna appeared to need aid. She was apparently unconscious. She did not respond when Styles shined a spotlight at her, did not rouse when he knocked on her

6

car's roof, and did not answer or stir when he asked about her. Because she appeared to be unconscious, a reasonable, objective person would believe that intervention was necessary. When she did respond to Styles, she showed signs of intoxication or another medical issue because she did not speak coherently. See *State v. Selders*, No. 94,983, 2006 WL 2265163, at *1-2 (Kan. App. 2006) (unpublished opinion) (holding that officer's approaching a vehicle with a slumped over driver, his waking of the driver, and his request for the driver to exit the vehicle to make sure he was okay was a lawful public safety stop).

Third, Styles was never assured that McKenna was not in peril or was no longer in need of assistance. Her lack of coherence continued in varying degrees throughout the encounter, as the video convincingly shows. Her eyes repeatedly shut, her head continually slumped forward and back, she was often completely unresponsive to the officer's questions, and when she did respond her speech was either slurred or unintelligible. Nothing that happened before the dispatcher told Styles of the warrant for McKenna's arrest would have dispelled a reasonable officer's lingering concerns that McKenna was either having some medical issue or was intoxicated. In either event, Styles did not think she could drive. These facts contrast to those in *State v. Bluthardt*, No. 116,401, 2017 WL 948330 (Kan. App. 2017) (unpublished opinion). There, a panel of this court found an initial safety stop valid when an officer learned that two persons appeared to be passed out in a car with the engine running. But the safety stop ended when the officer learned that they did not need help and had simply fallen asleep in the car while waiting for a friend. Yet leaving McKenna alone, given the totality of the circumstances, would seem to invite trouble.

Styles testified that his questions—asking for McKenna's identification, asking where she was staying, asking if she had anything to drink, and running her name through the police system—were meant to check on McKenna's welfare. The district court strongly credited his testimony.

7

"[THE COURT]: Officer Styles I find to be a credible witness. I would have found him not to be doing his job and his duty if you're driving down the street and see a vehicle in that situation with the window open and an individual's head down. He was doing his job and did it properly. That's what he's required to do.

"Had he not stopped and someone found a dead body in that vehicle the next day he would have been hung out to dry by the media and everyone, and rightfully so. That person could have been having a diabetic attack, might have had a heart attack. Once he got up to the car clearly there was something wrong with the defendant whether it was alcohol, drugs, whether she was having diabetic problems or any other number of problems that would create that. I, I can find absolutely nothing wrong in what the officer did. I don't even, I do not consider that a close case at all. And quite honestly, would have expected any officer to take the action he did."

The record shows Styles' actions were motivated by a desire to render aid or assistance, rather than to investigate criminal activity.

McKenna contends that Styles crossed the line from any caretaking function to an investigatory detention by asking her name and then running a warrants check. In other words, she alleges that the officer's behavior and the scope of the intrusion were not reasonably tailored to the community caretaking need.

But our Supreme Court has held that "an officer's mere request for identification or [identifying] information does not, by itself, constitute a seizure." *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008). This court has repeatedly held that an officer may request identification during a public safety stop. See, e.g., *State v. Manwarren*, 56 Kan. App. 2d 939, 948-49, 440 P.3d 606 (2019); *Messner*, 55 Kan. App. 2d at 637. Thus, an officer may walk up to individuals and ask their name and for identification, but the officer cannot force an answer. *State v. McKeown*, 249 Kan. 506, 509, 819 P.2d 644 (1991); see *State v. Baacke*, 261 Kan. 422, 437, 932 P.2d 396 (1997).

8

Styles' request for McKenna's name was not inconsistent with the community caretaking function. Styles did not force McKenna to give him her name. He asked for it—repeatedly, because she was incoherent—and she eventually answered. But Styles did not demand any documentation to verify McKenna's response as he would have done had he detained her for investigative purposes.

So this case turns on whether Styles' request to run a warrants check on McKenna exceeded the scope of the community caretaking function. After Styles got McKenna's name, he asked dispatch to "check the in-house" computer. He learned a couple of minutes later of a warrant for her arrest. Had Styles been conducting a criminal investigation instead of merely executing his community caretaking function, he likely would have asked his dispatcher to run a "Triple I" check on McKenna, as did the officer in *Gonzales*. See 36 Kan. App. 2d at 448. (A Triple I check refers to the "Interstate Identification Index," a "federal-state system for the exchange of criminal history records." 28 C.F.R. § 20.3[m] [2018].) Instead, Styles merely asked dispatch to "check the in-house" information, and that check disclosed the warrant.

McKenna contends that running a name for wants and warrants is generally inconsistent with a community caretaking function. That may or may not *generally* be true. Generally, an officer gets and keeps some identification papers when checking for warrants. That did not happen here. And asking for and verbally getting a name, given the situation McKenna found herself in, coupled with the facts established by Styles' testimony, is not necessarily for investigative purposes. Styles testified that his practice in similar situations was to drive the intoxicated person home, and that is what he anticipated doing here. And if he were to drive her home in his car, it is reasonable for him to want to know whether she was wanted for a violent crime and may pose a danger to him. For that matter, doing a quick limited check for warrants while interacting with McKenna was reasonable as a check for potential dangers. Styles' act of running a local

warrants check, under these circumstances, was directly tied to the public safety concern that instigated the stop.

It is important that Styles did not take from McKenna an identification card, a driver's license, or any other item. An encounter becomes a detention once a reasonable person would no longer have felt free to go. Generally, when an officer takes a person's identification, that person no longer reasonably feels free to leave until the document is returned. *State v. Grace*, 28 Kan. App. 2d 452, 458, 17 P.3d 951 (2018). But nothing Styles did compelled McKenna to wait for the dispatcher to respond. Her own needy condition caused that result.

We noted the distinction between requesting a name and retaining a document in *Weaver*, where a panel found "[b]y requesting and retaining Weaver's driver's license before he refused medical treatment, [the officer] impermissibly engaged in investigative acts during the safety stop":

> "The body camera footage also shows that Purdin obtained and retained Weaver's driver's license and asked about ownership of the car Weaver was driving before Weaver refused medical treatment and the medics left the scene. Our Supreme Court has held that an officer's mere request for identification usually will not constitute a seizure. See *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008). But in *Pollman*, the court held that an officer's retention of an identification card is one factor to be considered in applying the totality of the circumstances test, and that factor may, absent offsetting circumstances, mean a reasonable person would not feel free to leave or otherwise terminate an encounter with the officer. 286 Kan. at 889. Similarly, this court has repeatedly held that although an officer may request identification during a public safety stop, retaining an identification card or driver's license exceeds the scope of a public safety stop. See, e.g., *State v. Manwarren*, No. 119,520, 2019 WL 1575375, at *6-7 (Kan. App. 2019); *Messner*, 55 Kan. App. 2d at 637." *State v. Weaver*, No. 119,956, 2019 WL 2147678, at *8 (Kan. App. 2019) (unpublished opinion).

That Styles never took or kept any of McKenna's documents distinguishes this case from others we have decided, including the recent case of *State v. Ellis*, 57 Kan. App. 2d 477, 453 P.3d 882 (2019), that McKenna cites.

> "This court has held on multiple occasions, however, that an officer goes beyond the permissible scope of a *welfare check or public-safety stop* by retaining a person's identification and running a records check for wants and warrants. See *Manwarren*, 56 Kan. App. 2d at 948-49; *Messner*, 55 Kan. App. 2d at 637; *Gonzales*, 36 Kan. App. 2d at 458. This is because an officer's authority to conduct welfare checks and safety stops is not based on a suspicion of criminal activity, but rather a need to check on a person's health or confirm the safety of a situation. Once an officer determines the person is not in need of assistance, the welfare check ends. Any further action constitutes an investigatory detention. See *Manwarren*, 56 Kan. App. 2d at 949; *Messner*, 55 Kan. App. 2d at 637."
> *Ellis*, 57 Kan. App. 2d at 484.

See also *State v. Brodin*, No. 101,422, 2010 WL 1462709 (Kan. App. 2010) (unpublished opinion) (finding when the officer asked for and obtained Brodin's driver's license the encounter stopped being an encounter and became a detention); *State v. List*, No. 102,851, 2010 WL 5490733 (Kan. App. 2010) (unpublished opinion) (finding officer's request for identifying documentation exceeded the scope of the safety stop and thus violated List's constitutional rights).

Under these facts, no suppression was warranted. Styles' contact with McKenna was justified as a public safety stop and did not exceed its bounds. We find it unnecessary to reach the State's alternative argument that the attenuation doctrine applies.

Affirmed.