NOT DESIGNATED FOR PUBLICATION

No. 125,812

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICOLE WILLARD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; KEITH SCHROEDER, judge. Oral argument held August 5, 2025. Opinion filed October 24, 2025. Reversed and remanded with directions.

*Dylan Pryor*, of Kansas Appellate Defender Office, for appellant.

*Brian Koch*, assistant district attorney, *Thomas Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., COBLE and BOLTON FLEMING, JJ.

BOLTON FLEMING, J.: On May 13, 2021, Nicole Willard was the subject of a welfare check after a civilian reported that someone was unconscious under a bridge in Hutchinson, Kansas. Hutchinson Fire Department (HFD) firefighters initially responded, making contact with Willard and offering her aid, which she refused. A few minutes later, Sergeant Cole Long of the Hutchinson Police Department (HPD) arrived.

Less than three minutes after Long arrived on the scene, Captain Ian Arndt of the Hutchinson Fire Department provided Willard's name to Long, and Long immediately

1

stepped away, contacted dispatch, and requested a warrant check. Long learned that Willard was the subject of a warrant.

Just a few minutes later, emergency medical services (EMS) arrived on scene, and relieved the firefighters. EMS was able to establish a rapport with Willard, and she allowed them to take her vitals. At the conclusion of those checks, Long informed Willard she was the subject of a warrant. Willard was arrested, and following her arrest, officers found methamphetamine and drug paraphernalia in her possession. Willard was charged with possession of methamphetamine, a severity level 5 drug felony, and possession of drug paraphernalia, a class B misdemeanor.

While the case was pending, Willard filed a motion to suppress the evidence, arguing that what started as a lawful public welfare check was transformed into an illegal investigatory detention when Long checked her name for warrants. The district court denied the motion. A bench trial on stipulated facts followed, and the district court found Willard guilty of both possession of methamphetamine and possession of drug paraphernalia.

On appeal, Willard raises a single issue: whether the district court erred in denying her motion to suppress.

We find that based on the specific facts of this case, Willard has established that an unlawful seizure occurred under the Fourth Amendment to the United States Constitution. What began as a lawful public welfare check resulted in a prohibited investigatory detention because once it was clear to the firefighters and Long that Willard was not in need of assistance, the encounter should have ended. There is also no evidence in the record that Willard presented any type of danger to those on the scene, and there is no evidence that Long or the firefighters intended to transport Willard, which might have given them a valid reason to check her name for warrants. Moreover, there is no evidence

2

in the record that Long suspected Willard had committed or was about to commit a crime. Long simply testified that it is his practice to check for warrants whenever he encounters an individual.

Therefore, we find that the district court erred in denying Willard's motion to suppress, and accordingly, we reverse the district court's denial of the motion to suppress, reverse Willard's convictions, vacate Willard's sentences, and remand the case for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 13, 2021, Captain Ian Arndt of the Hutchinson Fire Department and two other firefighters answered a call to respond to 11th and Whiteside Streets in Hutchinson to perform a welfare check on an unconscious person. Upon arrival, the firefighters exited their fire rig and were met by a civilian that had made the initial call. The civilian led the firefighters to the unconscious person. Arndt noted that as he approached, he could see that a woman was lying under a bridge and not moving. The firefighters could see that she was breathing, and Arndt shook her a little bit to wake her up. When the woman awoke, she was unhappy, and did not want to give much information, nor would she allow firefighters to take her vitals. Willard responded to requests made by Arndt, even if they were uncooperative responses. Arndt was able to get the woman's name— Nicole Willard. It is policy that HFD firefighters obtain names from everyone they serve.

Approximately three to five minutes after HFD firefighters arrived on the scene, Sergeant Cole Long of the Hutchinson Police Department arrived in response to an HPD dispatch call that advised a female was currently unresponsive and lying under a bridge. Long remained a short distance back from Willard and the firefighters.

When Long arrived, the firefighters were talking to Willard. Willard was sitting with her back to the bridge abutment and there were three firefighters positioned in a

3

tight semicircle around her. Long remained a short distance from Willard and the firefighters. Willard told the firefighters that she wanted to call someone. The firefighters did not know who the person was, but Officer Long was familiar with him. Willard said to Officer Long that the firefighters would not let her make a phone call. A firefighter told Willard she was free to call someone if she wanted to, but before she could call someone, she received a call herself. Officer Long helped Willard describe her location to the person on the phone, and she asked the person to come pick her up. Willard could be heard telling the person on the phone to hurry up because she thought she was going to be taken to jail.

Upon Long's arrival, Arndt walked away from Willard and to the area where Long was standing. Arndt advised Long of the general circumstances of finding Willard and advised that they had shaken Willard to wake her up. Arndt then showed Long a piece of paper and stated, "that's the name that she gave us." Long then walked to the side, further away from Willard, and contacted HPD dispatch to run Willard's name for warrants. Long provided no reason for running the warrant check on Willard except that this was his standard practice when he has contact with anyone. Long never took any identification, or anything else, from Ms. Willard.

Long's warrant check on Willard occurred less than three minutes after he arrived on the scene. The warrant check process took about five minutes, and during this time firefighters continued to visit with Willard. EMS providers arrived a few minutes later and gained permission from Willard to check her vitals. She did not require treatment. Once EMS arrived, the firefighters were released from the scene. Long would later testify that he did not personally check on the welfare of Willard, and "left fire and EMS to do what they were doing." Willard remained seated throughout the encounter, surrounded by first firefighters and later EMS providers.

Willard was still on the phone giving directions to her location when EMS began to wrap up. She was just telling the person on the phone that it was "all good" when Long

4

advised Willard that she had a warrant and, as a result, would be taken into custody. Long then arrested Willard and took her to jail.

When Willard was searched at the jail, officers found a plastic wrapper containing methamphetamine. As a result of the search, the State charged Willard with one count of possession of methamphetamine and one count of possession of drug paraphernalia.

Prior to trial, Willard moved to suppress the evidence obtained from the encounter. She argued that Long went beyond the lawful scope of a welfare check when he ran her name for warrants, and, thus, the drugs discovered because of the encounter must be suppressed. After a hearing, the district court denied the motion to suppress, finding "I have trouble finding that this is either a stop or seizure as contemplated by the Fourth Amendment . . . ." The district court's ruling was not journalized.

Following a bench trial on stipulated facts, the district court found Willard guilty on both counts. The district court sentenced Willard to 18 months' probation including mandatory drug treatment pursuant to Senate Bill 123 with an underlying sentence of 13 months in prison for possession of methamphetamine and 6 months in jail for possession of the plastic wrapper.

Willard timely appeals.

ANALYSIS

DID THE DISTRICT COURT ERR IN DENYING WILLARD'S MOTION TO SUPPRESS?

Both parties agree that the encounter with Willard began as a valid welfare check that did not violate the Fourth Amendment. Willard argues, however, that Officer Long's actions in running a warrant check under these particular facts exceeded the scope of a welfare check and violated her Fourth Amendment right to be free from unreasonable seizures.

*Standard of Review*

The parties in this case participated in a hearing on Willard's motion to suppress. At the conclusion of that hearing, the district court entered its ruling:

"A law enforcement officer is trained. They first get called out to a scene the first thing, the first level of proof, I guess, in a criminal case is the fact they have no facts. They don't know why they're being called back there. They may be told to check on a suspicious person or check on the welfare of a person or what not. Once they arrive they begin to develop perhaps suspicion, subjected suspicion. May be more from the objects of suspicion in what I think Terry refers to as reasonable or articulable suspicion which may move into probable cause, may move into proof beyond a reasonable doubt. That's how evidence grows. Hindsight is 20/20.

"In this situation from the evidence I've heard law enforcement—First of all, they're not just strong men. They don't just show up to be bullies or some type of society's bouncers. That's not what they're, they're there to serve, protect, whether it be a cat in a tree or whether it be somebody with a flat tire or somebody who's got a medical condition or a car wreck. They're not just there. They have function as enforcing laws but in this situation it became pretty evident nobody knew what was going on other than perhaps Miss Willard had been bit by a snake. Perhaps Miss Willard was having heart issues or maybe diabetes issues or was the victim of violence. Perhaps it was a drug overdose. There was just no facts.

"It became pretty evident there was no stop made of Miss Willard. Her identification was not seized. From the start it clearly is an emergency situation involving

6

Hutchinson Fire Department and the police department arrived within a few minutes followed later by EMS. Nothing in the law says that the police department can't just run a contact name. They couldn't just run a little girl scout coming up to the door to sell cookies. There's nothing that says they can't run that name. In fact, there is tag scan technology that cars, patrol cars have, more and more of them if not all of them now, that allows them to scan a person's license plate that can determine whether it's displayed to the wrong vehicle or whether it's expired or information on the registered owner, whether that be the driver's license or whether they be a missing person or whether that be, they have warrants for their arrest. It's kind of scary sometimes when you think about information that big brother technology brings now to the hands of others but up to the commerce and state of identification that might be some of those vehicles' status based on scanning tags. I think there might be some that might not do that. Hopefully the courts can stop that. The bottom line is it's minimally intrusive.

"Minimal intrusiveness is really kind of the catch phrase here. Clearly there's a search incidental to arrest. There's no challenge of the validity of the search warrant. The video in this case showed that Sergeant Long was no closer than 20 feet during the majority of this encounter. The fact is first contact with her was to advise her she had a warrant. Not even walk up and ask her for her I.D. I have trouble finding that this is either a stop or a seizure as contemplated by the Fourth Amendment so for those reasons I deny the defendant's motion to suppress."

The district court's ruling was not journalized. While the district court made limited factual findings in its rulings, it does not appear that the facts of this case are in dispute, especially considering that a body camera video of the incident was admitted as an exhibit during the hearing on the motion to suppress.

Where, as here, "the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review." *State v. McDonald*, 318 Kan. 486, 487, 544 P.3d 156 (2024).

7

*Was Willard the subject of an unreasonable seizure under the Fourth Amendment to the United States Constitution?*

The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures by the government. And when a defendant moves to suppress evidence based on a violation of the Fourth Amendment, it is the government's burden to prove to the district court that the search and seizure was lawful using a preponderance of the evidence standard. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

Courts apply a totality of the circumstances test to determine whether or not a seizure has occurred. A seizure occurs "when the totality of circumstances surrounding the incident would communicate to a reasonable person the person is not free to disregard the officer's questions, decline the officer's requests, or otherwise terminate the encounter, and the person submits to the show of authority." *State v. Williams*, 297 Kan. 370, 377, 300 P.3d 1072 (2013). Hence, the test here is whether a reasonable person in Willard's position would have felt free to terminate the encounter. *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008).

Once we have determined whether a seizure has occurred, we must then determine whether the seizure was reasonable. "Because the Fourth Amendment only forbids 'unreasonable' seizures, reasonableness is the touchstone for analysis of whether a seizure is constitutionally permissible." *State v. Reiss*, 299 Kan. 291, 297, 326 P.3d 367 (2014).

A warrantless search or seizure is presumptively unreasonable unless it falls within a recognized exception to the warrant requirement. See *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014).

8

"There are generally four types of encounters between individuals and police: (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety or public welfare stops, and (4) arrests." *McDonald*, 318 Kan. at 488. The parties agree that the encounter in this case was a public welfare check. An encounter based in public safety "may justify a warrantless seizure even when no civil or criminal infractions have occurred, so long as the encounter is based on specific and articulable facts." *McDonald*, 318 Kan. at 488 (citing *State v. Hanke*, 307 Kan. 823, 827-28, 415 P.3d 966 [2018]).

As an aside, our Supreme Court has used the terms "public welfare stop" and "public welfare check" interchangeably, and the same legal principles generally apply to both terms.

> "Instances of courts policing the limits on law enforcement's use of public welfare stops is nothing new. We have previously said '[d]espite repeated admonitions to the State that police may not use public welfare checks as a basis for conducting background investigations and warrant checks . . . such conduct persists.' *Ellis*, 311 Kan. at 942, 469 P.3d 65; see also *State v. Gonzales*, 36 Kan. App. 2d 446, 453, 141 P.3d 501 (2006) ('Once safety stops are permitted, then there must be limits placed upon them; otherwise, any pretext could serve as a reason to stop.')." *State v. McDonald*, 318 Kan. at 488-89 (quoting *State v. Ellis*, 311 Kan. 925, 942, 469 P.3d 65 [2020]; *State v. Gonzales*, 36 Kan. App. 2d 446, 453, 141 P.3d 501 [2006]).

In *Gonzales*, our court adopted a three-part test to determine the legality of a public welfare check or stop. First, as long as there are objective, specific, and articulable facts from which an experienced law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate. Second, if the citizen needs aid, the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute an unreasonable seizure, implicating the protections provided by the Fourth Amendment. *Gonzales*, 36 Kan. App. 2d at 456. The Kansas

Supreme Court chose to utilize the test created in *Gonzales* within its *Ellis* decision. *Ellis*, 311 Kan. at 930 ("We deem the *Gonzales* test appropriate in analyzing the legality of the search in the present case.").

The Kansas Supreme Court's decision in *Ellis* heavily guides our analysis in this case. In *Ellis*, a police officer, William Kent, was dispatched to a Casey's General Store to check on the welfare of a woman, Shelbie Ellis. Ellis had been in a restroom stall for over 45 minutes and, at one point, was seen on her hands and knees on the floor. When Officer Kent arrived, he announced his presence from outside the restroom door. He told Ellis he had been asked to check on her. Ellis told Kent she was feeling well and asked him if she needed to come out. Kent asked her to step out of the restroom so that he could see if she was okay. Ellis told Kent she was having stomach issues but stepped out of the restroom. Kent then asked Ellis if he could see her driver's license. He did not return the driver's license to Ellis. Instead, he called the dispatch to check for outstanding warrants. He then directed Ellis to step outside the store to look for the person she was traveling with. When they could not find the friend, Kent asked Ellis to call the friend. While they were waiting, the dispatch informed Kent that Ellis had a possible outstanding warrant. Kent arrested Ellis for the warrant, searched her, and found methamphetamine and drug paraphernalia. As a result of the search, the State charged Ellis with possession of methamphetamine and possession of drug paraphernalia. 311 Kan. at 926-28.

Ellis moved to suppress the evidence. She argued that the seizure and search exceeded the lawful scope of the encounter. The district court denied the motion, and Ellis appealed. The Court of Appeals reversed the district court's decision. The Kansas Supreme Court granted the State's petition for review and affirmed the Court of Appeals. 311 Kan. at 928, 943.

In analyzing the question of whether Ellis was illegally seized, the Kansas Supreme Court began by noting that Officer Kent's initial "contact with Ellis was justified

by safety reasons based on specific and articulable facts." 311 Kan. at 930. The court did not specify whether the initial encounter in the restroom amounted to a seizure; the court just said, "This interaction was lawful." 311 Kan. at 930.

Next, the court found that Kent's request that Ellis provide identification "was also lawful." At that point, the court held, "the welfare check had been completed." 311 Kan. at 930.

But the "nature of a police-citizen encounter can change, however, and what may begin as a welfare check can transform into an investigative detention if the police conduct changes." 311 Kan. at 930.

The *Ellis* court went on to consider the totality of the circumstances and found that the encounter "was clearly more than a welfare check; she reasonably would have felt she was being subject to a criminal investigation and she was not free to leave." 311 Kan. at 931. The court based its finding on a number of factors, including that Kent held Ellis' driver's license, he escorted her out of the restroom and out of the store, and he directed her to make calls for a ride home. 311 Kan. at 930. The court also noted that the presence of more than one officer on the scene is a factor the court can consider:

> "Furthermore, the presence of more than one officer increases the coerciveness of an encounter, and, although the presence of two uniformed and armed officers does not automatically transform every police-citizen encounter into a nonconsensual one, it is a relevant factor for courts to consider in determining whether a citizen's interaction with law enforcement is consensual." 311 Kan. at 931.

"In order for an officer to go beyond a voluntary encounter or a public safety check and detain a person for further investigation, the officer must have '"reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction. [Citations omitted.]"'" *Ellis*, 311 Kan. at 931 (quoting *State v. Chapman*, 305 Kan. 365, 370, 381 P.3d 458 [2016]).

11

The court in *Ellis* found that no reasonable suspicion existed:

> "Here, Kent had no reasonable suspicion that Ellis was committing, had committed, or was about to commit a crime. Kent testified that he saw no evidence of criminal activity and that Ellis assured him that she was not in need of assistance. Kent nevertheless retained her license and placed a call to dispatch for the express purpose of extending his investigation into whether she had any outstanding warrants. He directed her to go outside and call for someone to pick her up, and he interrogated her about drug use and told her he wanted to search her belongings. All of these activities broke the chain of lawful conduct that began when he responded to a welfare call." *Ellis*, 311 Kan. at 932.

Thus, in Kansas, a welfare check cannot lawfully be extended by running a warrant check without good reason. "Our caselaw makes it clear that police may not lawfully extend a welfare check by running a warrant check on an individual who is the subject of the check unless some other circumstances support prolonging the check and converting it into a detention." 311 Kan. at 932.

Willard urges us to also consider *State v. Manwarren*, 56 Kan. App. 2d 939, 440 P.3d 606 (2019), as authority that Sergeant Long unlawfully extended the duration of the welfare check in the present case.

In *Manwarren*, Officer Michael Rivers performed a welfare check on a man in a ditch, later identified as Richard Manwarren II. Rivers concluded that Manwarren was okay and, thus, the welfare check was complete. But rather than leaving, Rivers asked Manwarren for his identification card. Manwarren complied. Rivers retained the card and called dispatch to run a warrant check. After discovering an outstanding warrant, Rivers arrested Manwarren. Manwarren had drugs and a scale on his person, so the State charged him with various crimes. 56 Kan. App. 2d at 942.

12

Manwarren moved to suppress the evidence. The district court granted the motion to suppress, and a panel of this court affirmed. 56 Kan. App. 2d at 944, 957. The *Manwarren* panel reasoned that an illegal seizure occurred when Officer Rivers took Manwarren's identification card because, at that point, the welfare check was complete and Officer Rivers did not have reasonable suspicion to extend Manwarren's detention. 56 Kan. App. 2d at 948-49.

The State argues that the present case is more analogous to *State v. McKenna*, 57 Kan. App. 2d 731, 459 P.3d 1274, *rev. denied* 312 Kan. 898 (2020). There, Officer Daniel Styles stopped to investigate a woman in a vehicle who appeared to be asleep or unconscious. He asked her for her name, and, after much prompting, she verbally identified herself as Tia McKenna. Styles then called dispatch and asked if McKenna had any warrants. Two minutes later, the dispatch reported that McKenna had an outstanding warrant, so Officer Styles arrested her. During an intake search at the jail, officers found drugs in McKenna's possession and the State charged her with possession. McKenna moved to suppress the evidence, but the district court denied the motion. McKenna was convicted as charged, and she appealed. 57 Kan. App. 2d at 731-33.

The Court of Appeals affirmed the district court's decision. The court began its analysis by finding that the initial encounter was a valid public safety stop. 57 Kan. App. 2d at 735-36. Next, the court held that asking for McKenna's name was lawful, citing the repeated holdings from Kansas appellate courts that an officer's mere request for identification does not constitute a seizure. 57 Kan. App. 2d at 737. The court noted that Officer Styles did not force McKenna to give him her name or demand documentation to verify her response. 57 Kan. App. 2d at 737-38. Ultimately, the court reached the crux of the matter—whether Officer Styles' request to run a warrant check on McKenna exceeded the scope of the community caretaking function that justifies public safety stops. On this point, the court stated:

13

"McKenna contends that running a name for wants and warrants is generally inconsistent with a community caretaking function. That may or may not *generally* be true. Generally, an officer gets and keeps some identification papers when checking for warrants. That did not happen here. And asking for and verbally getting a name, given the situation McKenna found herself in, coupled with the facts established by Styles' testimony, is not necessarily for investigative purposes. Styles testified that his practice in similar situations was to drive the intoxicated person home, and that is what he anticipated doing here. And if he were to drive her home in his car, it is reasonable for him to want to know whether she was wanted for a violent crime and may pose a danger to him. For that matter, doing a quick limited check for warrants while interacting with McKenna was reasonable as a check for potential dangers. Styles' act of running a local warrants check, under these circumstances, was directly tied to the public safety concern that instigated the stop.

"It is important that Styles did not take from McKenna an identification card, a driver's license, or any other item. An encounter becomes a detention once a reasonable person would no longer have felt free to go. Generally, when an officer takes a person's identification, that person no longer reasonably feels free to leave until the document is returned. *State v. Grace*, 28 Kan. App. 2d 452, 458, 17 P.3d 951 (2001). But nothing Styles did compelled McKenna to wait for the dispatcher to respond. Her own needy condition caused that result." 57 Kan. App. 2d at 738-39.

While it is true that the officer did not take an identification card or driver's license from McKenna, retention of an identification card is but one factor for the court to consider in examining the totality of the circumstances to determine whether a person no longer reasonably feels free to leave. See *State v. Pollman*, 286 Kan. 881, 889, 190 P.3d 234 (2008). So while it is true no firefighter nor Sergeant Long ever took Willard's driver's license, that is only one of many factors for the court to consider.

In addition, there is an important factual distinction between the present case and *McKenna* that should be noted. In *McKenna*, the court emphasized that Officer Styles

intended to give McKenna a ride home if she was intoxicated rather than allow her to drive. 57 Kan. App. 2d at 732. The McKenna panel noted that it was reasonable for Officer Styles to check for warrants if he was going to have McKenna in his car. In contrast, there is no evidence that Long, the firefighters, or EMS were going to transport Willard anywhere. In fact, Willard was in the process of obtaining a ride from a friend, with the assistance of Long. There is also no evidence in the present case that Willard posed any kind of danger to herself, the responders, Long, or the public.

Admittedly, the facts of the present case are unique. Here, firefighters were the first to respond to the call for a welfare check. The actions of firefighters may be considered in a Fourth Amendment analysis. See *Michigan v. Tyler*, 436 U.S. 499, 506, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978) ("[T]here is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman."). Here, the firefighters responded to a welfare check as part of their regular duties of employment, and as Arndt testified, responding to welfare checks was a normal part of their duties. Under these facts, we may consider the actions of the firefighters as part of a larger inquiry into the totality of circumstances of the encounter. See *State v. Smith*, 243 Kan. 715, 722, 763 P.2d 632 (1988).

Three HFD firefighters arrived on the scene in response to a welfare check request for a person reported to be unconscious under a bridge. When the firefighters arrived, they discovered Willard sleeping under the bridge, and they were able to wake her by shaking her shoulders. Willard did not wish to speak to the firefighters, nor is there any evidence she requested or required medical care. Once awake, Willard sat up with her back to the support of the bridge, and the three firefighters formed a small semi-circle around her. While one firefighter would eventually step away, two firefighters remained in close proximity to Willard until EMS arrived.

15

Sergeant Long arrived approximately three to five minutes after the firefighters, but he remained at a short distance from Willard and the firefighters and did not participate in the welfare check other than to approach the semi-circle of firefighters and Willard to say he knew the person Willard was hoping to contact for a ride, and to identify the location for Willard so a friend could pick her up.

For most of the encounter, three firefighters encircled Willard, and Long stood a short distance away, within Willard's line of sight. The firefighters and Long were in official uniforms as well. We must consider the presence of multiple firefighters and a law enforcement officer in our totality of the circumstances analysis. See *Ellis*, 311 Kan. at 931.

It is prudent under this set of facts for the court to also consider Willard's physical location as compared to the firefighters and Long as a factor part of the totality of circumstances test. It is uncontroverted that Willard was sleeping when firefighters first arrived. After the firefighters woke Willard up, she sat up with her back to a concrete buttress of a bridge. Three firefighters formed a small semi-circle around her to talk to her. Once Long arrived, he remained at a distance but within easy eyesight of Willard.

Timing is also an issue in this case. Long was given Willard's name by Arndt very shortly after he arrived. And Long called dispatch to check Willard's name for warrants less than three minutes after arriving on the scene. In other words, the warrant check occurred very early into the encounter with Willard. During that very short period of time there were simply no events that would justify running Willard's name for a warrant. She was not suspected of committing a crime, she did not pose a danger, and she was not being transported. Willard was simply woken up by firefighters and was sitting with her back to the wall of a bridge. But based on the events that *did* transpire in that short time period, which included Willard being surrounded by uniformed firefighters in a small semi-circle, with a uniformed police officer standing nearby, and being seated with her

back to the wall, the totality of circumstances would communicate to a reasonable person that they were not free to leave. A reasonable person in Willard's position would not have felt free to terminate the encounter. See *Williams*, 297 Kan. at 377; *Pollman*, 286 Kan. at 888. This is further illustrated by Willard's statement to a person on the phone that she believed she was going to jail. Thus, a seizure occurred.

In determining whether that seizure was unreasonable, we apply a three-part analysis established in *Gonzales* to determine the legality of the public welfare check.

First, in the present case there were objective, specific, and articulable facts from which an experienced law enforcement officer would suspect that a citizen needs help, and so the firefighters and Long had the right to respond to the request for a welfare check and investigate the circumstances of the call. See *Gonzales*, 36 Kan. App. 2d at 456.

But problems begin to arise with application of the second factor. Under *Gonzales*, if the citizen needs aid, the officer may take appropriate action to render assistance. 36 Kan. App. 2d at 456. But here, Willard quickly made it known she did not require aid and did not wish to have her vitals taken. At this point, the firefighters and Long were all satisfied that Willard was not in need of assistance because they allowed her to start making arrangements to be picked up by a friend. In fact, Long assisted Willard in giving directions to her friend to come pick her up.

This brings us to the third factor—once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment. *Gonzales*, 36 Kan. App. 2d at 456. Once Willard refused care, and Long and the firefighters decided her friend could come pick her up, it was clear that she was not in peril and no longer in need of assistance. It was at this point the encounter should have ended.

17

Reasonable searches and seizures must be supported by a valid warrant or by one of the warrant-requirement exceptions defined by the United States Supreme Court. *State v. Doelz*, 309 Kan. 133, 140, 432 P.3d 669 (2019). While a lawful welfare check is an exception to the probable cause requirement, here what began as a lawful welfare check ended as an unlawful investigatory detention. "Our appellate courts have repeatedly held that a public safety check must end upon a determination that the individual who has been stopped is not in need of assistance." *Ellis*, 311 Kan. at 939.

There is no reasonable and articulable explanation for why Long decided to run a warrant check on Willard except that it is his practice to do so in every encounter. Such a policy appears to be contrary to the rationale our Supreme Court reiterated in *Ellis*. The court was clear in its admonition: "Despite repeated admonitions to the State that police may not use public welfare checks as a basis for conducting background investigations and warrant checks for citizens who may exhibit need for medical attention or police help, such conduct persists." 311 Kan. at 942.

Long's decision to run a warrant check "was completely unnecessary to serve the purpose for which [he] was dispatched, and it converted the stop into an investigatory stop and search without reasonable suspicion of criminal activity." *Ellis*, 311 Kan. at 933.

"The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). Long's actions were unreasonable under these specific facts, and the State has failed to carry its burden to show that the seizure was lawful by a preponderance of the evidence. See *Porting*, 281 Kan. at 324.

The district court erred in denying Willard's motion to suppress. We reverse the district court's decision to deny the motion to suppress, reverse Willard's convictions,

vacate her sentences, and remand the case to the district court with an instruction to grant the motion to suppress. See *State v. Sharp*, 305 Kan. 1076, 1085, 390 P.3d 542 (2017).

Reversed and remanded with directions.

\* \* \*

GARDNER, J. dissenting:  I respectfully dissent. Nicole Willard contends solely that the lawful encounter became an unlawful investigatory detention because Sergeant Cole Long ran a warrant check during a welfare check. Yet no authority so holds.

Willard states only one argument on appeal—that the officer illegally seized her by running a warrant check on her without reasonable suspicion of a crime. Her consistent argument is that the officer "transformed the public welfare stop into an investigatory detention" by running the warrant check on a seized person without reasonable suspicion. She asserts that warrant checks are investigatory in nature, violating the rule that public welfare stops must be "'totally divorced'" from the investigation of crime. The majority's analysis fails to resolve that issue.

This case was tried on stipulated facts. The most relevant controlling fact states:

"While the fire department was medically examining Ms. Willard, Sgt. Long radioed her name to dispatch to see if she had any active warrants. Sgt. Long testified that this was standard practice when he has contact with anybody. Sgt. Long was informed by dispatch that Ms. Willard had an active arrest warrant. Sgt. Long waited for EMS to medically clear Ms. Willard, then he arrested her on her warrant. Sgt. Long never took any identification, or anything else, from Ms. Willard."

The facts are unlike those in our precedent.

19

I would find that a seizure did not occur, so the Fourth Amendment to the United States Constitution was not implicated. But even if a seizure did occur, all acts were lawful. Officer Long's decision to run the warrant check was consistent with public safety and did not unlawfully broaden or extend the scope of the encounter with Willard. Both before and after the warrant check, Officer Long's contact with Willard was justified by safety reasons based on objective, specific, and articulable facts. The majority's contention that the justification dissipated when Willard said she did not want assistance is unfounded.

I.       *No search or seizure occurred; thus, the Fourth Amendment was not implicated.*

 *No search occurred.*

A "'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). The officer's interactions with Willard were not in her home, in a car, in a building, or in any other confined space. They were outside in the open air. And Officer Long stayed about 20 feet away from her throughout the encounter except for telling her where she was so she could relay that information to her friend whom she had called for a ride home. Nothing about the officer's interaction with Willard was intrusive. The event was commonplace. True, a "search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). But the officer's interaction with Willard remained far from intense or intolerable.

 Running a warrant check is not a search subject to the Fourth Amendment.

"Indeed, in conducting a warrant check the officer does not 'search' at all in the constitutional sense: the object of the inquiry—an outstanding arrest warrant—is not a

20

personal document that an individual legitimately expects will remain private, such as his bank statements; rather, it is a court order recorded in the government's own files compiled from official reports of law enforcement agencies and the Department of Motor Vehicles, and is retrieved by use of state and local police communications systems. [Citation omitted.]" *People v. McGaughran*, 25 Cal. 3d 577, 582-83, 601 P.2d 207 (1979).

Any intrusion on Willard's privacy interest fails to rise to the level of a constitutionally cognizable infringement. "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. *Jacobsen*, 466 U.S. at 123." *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) (finding any intrusion on respondent's privacy expectations by a dog sniff of car's exterior while he was lawfully seized for a traffic violation did not rise to the level of a constitutionally cognizable infringement).

   *No seizure occurred.*

   Contrary to Willard's assertion, no bright-line rule states that every welfare check amounts to a seizure for Fourth Amendment purposes. True, our Supreme Court has held that stopping a vehicle to conduct a welfare check amounts to a seizure. *State v. McDonald*, 318 Kan. 486, 488, 544 P.3d 156 (2024) ("As far as the Fourth Amendment is concerned, a public safety traffic stop is a seizure."). That makes sense. But this was not a traffic stop. No vehicle was involved, no stop was made, no house was entered, and no person's movements were constrained by police.

   We apply a totality of the circumstances test to determine whether a seizure has occurred. A seizure occurs "when the totality of circumstances surrounding the incident would communicate to a reasonable person the person is not free to disregard the officer's questions, decline the officer's requests, or otherwise terminate the encounter, and the

21

person submits to the show of authority." *State v. Williams*, 297 Kan. 370, 377, 300 P.3d 1072 (2013).

The majority suggests that firefighters seized Willard, since the police officer was uninvolved with Willard throughout the encounter. But the firefighters' status as government employees does not make them government actors for Fourth Amendment purposes. See *State v. Brittingham*, 296 Kan. 597, 602, 294 P.3d 263 (2013). *Brittingham* found that public housing employees who entered an apartment without a warrant in reaction to a maintenance problem were not government actors within the meaning of the Fourth Amendment or section 15 of the Kansas Constitution Bill of Rights.

"[T]here was no suggestion that they were investigating the possibility of any wrongdoing, either civil or criminal, on the part of the apartment occupants. Their actions were entirely reactive, rather than exploratory or regulatory, in nature. . . . These employees did not seek to intrude, but rather they sought to protect. They were not government actors within the meaning of the Fourth Amendment or § 15 of the Kansas Constitution Bill of Rights." 296 Kan. at 606-07.

The same is true for these firefighters. They were called for medical assistance for an unconscious person under a bridge, and they sought to meet those needs. Willard does not suggest that they were investigating the possibility of any wrongdoing, either civil or criminal, on her part. The firefighters asked for Willard's name and address, as they routinely do for their report, but they took no exploratory or investigative acts. Here, as in *Brittingham*, "there is nothing here to support the underlying rationale for the exclusionary rule, which is 'to deter law enforcement and other government officials and agents from unreasonable intrusions upon the lives and property of citizens.'" 296 Kan. at 606. Under the objective facts, the firefighters were not government actors within the meaning of the Fourth Amendment or section 15 of the Kansas Constitution Bill of Rights.

22

Similarly, the police officer sought not to intrude but to protect. Officer Long had very little interaction with Willard. He did not ask her any questions. A firefighter gave Willard's name to the officer without the officer asking for it. This is legal.

"[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976) (citing cases).

Yet even had the officer asked Willard for her name with the intent to run it for a warrant check, that would have been legal.

"Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. '[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.' [Citation omitted.]" *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cty.*, 542 U.S. 177, 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004).

Officer Long also did not ask for or obtain from Willard any driver's license or other document. "Generally, when an officer takes a person's identification, that person no longer reasonably feels free to leave until the document is returned." *State v. McKenna*, 57 Kan. App. 2d 731, 738-39, 459 P.3d 1274 (2020). But nothing this officer said or did would have made a reasonable person feel as though he or she were not free to terminate the encounter.

Finally, Officer Long never restrained Willard's freedom of movement by physical force or show of authority or otherwise. A seizure occurs when the police apply physical force to restrain a person or, absent force, the person seized submits to police authority. *California v. Hodari D.*, 499 U.S. 621, 626-28, 111 S. Ct. 1547, 113 L. Ed. 2d 690

(1991); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) ("[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained."). Thus, Willard was never seized.

Under the objective totality of the circumstances test, we consider the effect of the officer's words and actions on a reasonable person. The officer's only act was to run a warrant check, but that act had no effect whatsoever on Willard and would have had none on a reasonable person in her position. A reasonable person would have had no way of knowing that Officer Long was confirming her identity by running her name for warrants. The officer did not move, question, command, detain, or otherwise impact Willard by his act, unknown to her, of running her name for warrants. Her freedom was not restrained. But for the arrest supported by probable cause after the welfare check ended, the welfare check would have been the same had Officer Long not run the warrant check. And once Officer Long discovered the warrant, he had a duty to arrest Willard. "'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.' [Citation omitted.]" *Utah v. Strieff*, 579 U.S. 232, 240-41, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) (explaining that it is lawful for officer to run a routine warrant check on defendant who has been detained in an investigatory stop because a warrant check is a negligibly burdensome precaution for officer safety).

The facts all point to a voluntary encounter. "Voluntary encounters are not considered seizures and do not trigger the protections of the Fourth Amendment." *Williams*, 297 Kan. at 376; *State v. Hanke*, No. 114,143, 2016 WL 4063975, at *9 (Kan. App. 2016), *aff'd* 307 Kan. 823, 415 P.3d 966 (2018).

II.    *Even if Willard was seized, her seizure was a legal public safety stop.*

But even if Willard was seized, grounds existed to justify a seizure. Willard concedes that before Officer Long ran the warrant check, the situation "could fairly be

24

classified as a public welfare stop." Yet she contends that running her for warrants under the facts of this case was investigatory in nature, and that welfare checks must be "'totally divorced'" from such actions. She concludes that, because Officer Long did not have reasonable suspicion, his act of running a warrant check transformed her lawful seizure into an unlawful seizure. She, and the majority, also ascribe importance to the lack of testimony about Officer Long's need to run the warrant check for safety reasons. I disagree.

Public safety reasons may justify a warrantless search or seizure without violating a person's Fourth Amendment rights. See *Brigham City v. Stuart*, 547 U.S. 398, 406, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (unanimously finding "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties"). The concept of public safety justifying a warrantless search or seizure was first recognized by the Kansas Supreme Court in *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511 (1992) ("We hold that a civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop, *if the safety reasons are based upon specific and articulable facts.*"). The *Vistuba* court found the United States Supreme Court case of *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973), "persuasive" in reaching its conclusion. 251 Kan. at 824. Willard's argument that welfare checks must be "'totally divorced'" from investigatory actions also relies on language from *Cady*, so I examine that case.

A.      Cady *recognizes public safety as basis for warrantless search of a vehicle.*

In *Cady*, the United States Supreme Court approved of the warrantless search of a vehicle on public safety grounds. 413 U.S. at 447-48. In that case, Chester Dombrowski, a member of the Chicago police force, crashed his vehicle. 413 U.S. at 435-36. Police arrested Dombrowski for drunk driving and had his car towed to a garage. 413 U.S. at 436. The police believed Chicago police officers were required to carry their service

25

revolvers at all times, but they did not find a revolver on Dombrowski's person, so they searched the vehicle that had been towed. 413 U.S. at 436-37. During the search, the police found a number of bloody items that eventually led to Dombrowski being convicted of first-degree murder. 413 U.S. at 434, 437.

The Supreme Court was tasked with determining whether the warrantless search of the vehicle was unconstitutional. The Court noted that its caselaw primarily involved contact with vehicles by federal law enforcement which "usually, if not always, involve[d] the detection or investigation of crimes unrelated to the operation of a vehicle." 413 U.S. at 440. Still, the Court noted that state and local police officers have much more contact with vehicles for reasons that do not involve detection or investigation of crime. The Court's explanation of the differences between local and federal police officer duties forms the basis of Willard's argument in this appeal. The Court stated:

> "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441.

The Court also noted that local officials engaging in community caretaking functions will sometimes bring them "in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." 413 U.S. at 442. Ultimately, the Court held that it was reasonable for officers to search Dombrowski's vehicle for two reasons: (1) The police lawfully exercised a form of custody or control over the vehicle; and (2)

26

the search of the vehicle "was 'standard procedure in (that police) department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." 413 U.S. at 442-43. In conclusion, the Court noted that the only test the Fourth Amendment provided for situations like this was reasonableness and that there was "very little that [it] might say here" that could "usefully refine the language of the Amendment itself in order to evolve some detailed formula for judging cases such as this." 413 U.S. at 439, 448.

Willard relies heavily on the proposition that police engaging in community caretaking functions, such as welfare checks, must act in a way "'totally divorced'" from investigation. Panels of this court, citing *Cady*, have also suggested that public safety stops must be totally divorced from the detection, investigation, or acquisition of evidence. See, e.g., *State v. Messner*, 55 Kan. App. 2d 630, 635, 419 P.3d 642 (2018); *State v. Morales*, 52 Kan. App. 2d 179, 183, 363 P.3d 1133 (2015); *State v. Gonzales*, 36 Kan. App. 2d 446, 456, 141 P.3d 501 (2006); *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 214-15, 99 P.3d 1125 (2004). Yet those panels did not face the facts here. The quotation, read in context, describes the nature of an officer's non-investigatory functions, and does not create a litmus test governing public safety stops. Rather, the Supreme Court clarified that the test governing such cases is reasonableness. *Cady*, 413 U.S. at 439.

This conclusion is reinforced by the Supreme Court's more recent decision in *Caniglia v. Strom*, 593 U.S. 194, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021). There, the Supreme Court held that a warrantless search of a home for public safety reasons was unconstitutional. 593 U.S. at 199. The Court found that, in coming to a different conclusion, lower courts had taken the community caretaking language from *Cady* out of context. The Court explained that *Cady*'s "recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." 593 U.S. at 199. The Court added:

"What is reasonable for vehicles is different from what is reasonable for homes." 593 U.S. at 199. One justice wrote a concurring opinion to note that *Cady* used the term "'community caretaking'" in passing, emphasizing that each case must be examined for reasonableness under its own facts. 593 U.S. at 200 (Alito, J., concurring) ("[W]e should not assume that the Fourth Amendment's command of reasonableness applies in the same way to everything that might be viewed as falling into this broad category."). Another justice observed that the Court recognized "various situations where a warrant is not required" based on "a commonsense appraisal of what is 'reasonable.'" 593 U.S. at 204 (Kavanaugh, J., concurring).

Willard, too, takes *Cady*'s community caretaking language out of context. She relies on it to claim that "[s]ince its inception, the 'community caretaking' exception to the Fourth Amendment has always meant to be 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" (quoting *Cady*, 413 U.S. at 441). But *Cady*'s recognition that police engage in non-investigatory tasks, like the welfare check in this case, is not so limiting. Officers engage in a wide variety of home, vehicle, and pedestrian encounters, and each must be examined in its own context. As long as an officer's actions are reasonable, as they are here, no Fourth Amendment violation occurs.

With this background, I will turn to the analysis of whether public safety reasons justified a seizure of Willard.

B. *Any seizure of Willard was justified by safety reasons based on specific and articulable facts.*

The *Ellis* court found a three-part test from the case of *State v. Gonzales*, 36 Kan. App. 2d at 456, to be "appropriate" in evaluating whether a public safety stop is lawful under the Fourth Amendment. *State v. Ellis*, 311 Kan. 925, 930, 469 P.3d 65 (2020). But

that test was developed in the context of *traffic* safety stops. *Gonzales*, 36 Kan. App. 2d at 457 (officer exceeded scope of traffic safety stop by asking about ownership of the truck and demanding and retaining the individuals' driver's licenses); see also *Messner*, 55 Kan. App. 2d at 637 (officer exceeded scope of traffic safety stop by seizing Messner's driver's license and checking for warrants); *Morales*, 52 Kan. App. 2d at 188 (seizing Morales after he prepared to drive his vehicle away was not a bona fide community caretaking function). Although our Supreme Court approved that test in *Ellis*, 311 Kan. at 930, the test is ill-fitted outside the traffic stop context. The *Ellis* court seems to have tacitly avoided that misfit by asking a more general question when analyzing the first issue—whether "Kent's contact with Ellis was justified by safety reasons based on specific and articulable facts." 311 Kan. at 930.

At any rate, the three-part test is met here. "First, as long as there are objective, specific, and articulable facts from which an experienced law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate." 311 Kan. at 929-30. The facts show that Officer Long was called a little after 7 p.m. to conduct a welfare check on an unconscious person lying under a bridge that carried traffic. Firefighters had arrived and awakened Willard, but she was uncooperative with their attempts to take her vitals. The captain of the firefighters gave Willard's name to Officer Long within two minutes after he arrived on the scene, without his asking for it. Willard concedes that the initial stop or encounter was legal. I agree.

C.      *The officer's actions during the welfare check were appropriate.*

"Second, if the citizen needs aid, the officer may take appropriate action to render assistance." *Ellis*, 311 Kan. at 930. Here, first responders arrived on the scene before the officer and took appropriate action to aid Willard, who was lying unconscious under a bridge. Officer Long had no interaction with Willard except to explain to her where she was—under the bridge where she said she lived. He was called to the scene not to render

29

medical aid but to keep the peace while others qualified to render medical aid did so. As our Supreme Court recognized in *Vistuba*, 251 Kan. at 824: Police officers have a "legitimate role as a public servant to assist those in distress *and to maintain and foster public safety*.'" (Emphasis added.)

Whether Officer Long took appropriate action is one of the biggest points of contention in this appeal. Willard argues that the act of running a warrant check is investigatory in nature and that welfare checks must be "'totally divorced'" from investigatory actions absent reasonable suspicion of crime. The majority also ascribes significance to the lack of testimony that first responders planned to transport Willard anywhere, using this to bolster its conclusion that Officer Long had no grounds to run a warrant check. I find these arguments unpersuasive, as explained below.

> D.   *The officer's mission was to maintain and foster public safety, including his own.*

"[T]he courts have been strict in recognizing that, as with any other police encounter, the scope of the detention during a public safety stop cannot exceed the justifications for the stop." *Gonzales*, 36 Kan. App. 2d at 455. Thus, a welfare check must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification. But the justification for any public welfare check is twofold. As our Supreme Court recognized in *Vistuba*, an officer conducting a welfare check has a dual role as a public servant: to assist those in distress and to maintain and foster public safety. 251 Kan. at 824. The majority errs by focusing exclusively on the first of these roles, but ignoring the second, equally important role. Although this was not a traffic stop, Officer Long had a safety interest inherent in the mission of his welfare check—to protect the safety of all involved, including himself.

30

Officer Long's mission was to maintain and foster public safety. He was not qualified to assist Willard with her physical or mental health needs. That was the mission for the firefighters and EMS, who had training in such matters. And Officer Long testified that he was not trained as an EMT and did not know how to take vital signs or administer drugs. In similar situations, he would routinely contact firefighters and EMS and let them render assistance. And it was typical for three agencies to show up at a welfare check such as this. The officer's mission or duty, when called to be on the scene to check the welfare of this unconscious person under a bridge, was thus not to render medical care, but to keep the peace and provide some level of protection for Willard, for those who could aid Willard, and for himself. Running a warrant check on Willard was within the scope of the officer's mission in this welfare check.

As the district court recognized, the officer had no idea whom he had been called to assist. The unresponsive person under the bridge that Officer Long was duty-bound to encounter, aid, and protect could have been a wanted fugitive, high on fentanyl, a victim of a perpetrator who lurked nearby, a missing person, a ploy in an ambush, or armed and dangerous. The safety of the firefighters, the EMTs, the officer, and perhaps Willard was at stake no matter the time of day. And unlike in typical welfare checks in homes or vehicles, there was no context for the officer's contact and no confinement of the person needing assistance. Willard's assertion that the warrant check was "'unnecessary to serve the purpose for which [the officer] was dispatched'" is thus incorrect.

Our court recognized this safety interest during a welfare check in *McKenna*, 57 Kan. App. 2d at 738, where we held that the officer's request to run a warrant check on McKenna did not exceed the scope of the community caretaking function that justifies public safety stops. There, as here, the officer did not take from McKenna an identification card, a driver's license, or any other item. We held that asking for a name during a welfare check and running the name for warrants was "not necessarily for

31

investigative purposes." 57 Kan. App. 2d at 738. Instead, it was for purposes of officer safety, as the officer anticipated driving the intoxicated person home.

> "And if he were to drive her home in his car, it is reasonable for him to want to know whether she was wanted for a violent crime and may pose a danger to him. For that matter, doing a quick limited check for warrants while interacting with McKenna was reasonable as a check for potential dangers. Styles' act of running a local warrants check, under these circumstances, was directly tied to the public safety concern that instigated the stop." 57 Kan. App. 2d at 738.

Here, as there, doing a quick check for warrants while the firefighters or EMTs interacted with Willard was reasonable as a check for potential dangers. It would be unreasonable to find that police can ask for a person's name during a welfare check but cannot use that name to confirm the person's identity. The purpose of getting a name from an individual in that context is to confirm identity, not so the officer can correctly address the individual during a police encounter. Running a warrant check is tied to the public safety concern that inheres in a welfare check.

Other recent cases have recognized the interest in officer safety in welfare checks.

> "Our cases have recognized that when analyzing a public safety stop, we consider the officer's concern for his or her own safety as a factor. For example, in *State v. Herron*, No. 121,959, 2021 WL 1836459, at *1-2 (Kan. App. 2021) (unpublished opinion), an officer who came across a driver stranded on the side of the road due to a flat tire offered the driver a ride. The driver accepted the offer, and the officer ran a quick check of the driver's identity to ensure his safety. On appeal, this court considered the officer's offer of assistance alongside his decision to run the driver's information in deciding whether a valid public welfare stop occurred. The panel found that, under those circumstances, the act of running the information fell within the context of the officer's valid public safety check. 2021 WL 1836459, at *11-12." *State v. Moran-Espinosa*, No. 126,306, 2025 WL 573877, at *5 (Kan. App. 2025) (unpublished opinion) (finding "[A] reasonable officer would immediately know, upon learning that the car was out of gas, that no quick fix was

32

possible, and he would have had to spend a good deal of time with three strangers before any assistance arrived. Doing so would pose a safety concern for the officer.").

Cf. *State v. Shively*, 268 Kan. 589, 595, 999 P.2d 259 (2000) (finding the Fourth Amendment may permit no-knock execution of search warrant at person's home based upon officer safety concerns).

It is well established that officer safety justifies running a warrant check during a traffic stop.

> "Traffic stops are 'especially fraught with danger to police officers,' *Johnson,* 555 U.S., at 330, 129 S.Ct. 781 (internal quotation marks omitted), so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. Cf. *United States v. Holt*, 264 F.3d 1215, 1221-1222 (C.A.10 2001) (en banc) (recognizing officer safety justification for criminal record and outstanding warrant checks), abrogated on other grounds as recognized in *United States v. Stewart*, 473 F.3d 1265, 1269 (C.A.10 2007). On-scene investigation into other crimes, however, detours from that mission. See *supra*, at 1615." *Rodriguez v. United States*, 575 U.S. 348, 356, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015).

Safety is a concern to officers, whether they are stopping a car in traffic or are called to help aid an unconscious person under a bridge, as here.

The same interest in officer safety that *Rodriguez* details for traffic stops is present in pedestrian welfare checks. As the Tenth Circuit found in *United States v. Villagrana-Flores*, 467 F.3d 1269, 1277 (10th Cir. 2006):

> "Officer safety . . . is just as strongly implicated where the individual being detained for a short period of time is on foot, rather than in an automobile. An officer detaining a pedestrian has an equally strong interest in knowing whether that individual has a violent past or is currently wanted on outstanding warrants."

The facts and circumstances support that Officer Long's act of running Willard's name for a warrant check was done to maintain the safety of all people involved in the welfare check. The officer's actions were reasonable given his responsibility to protect all persons in the encounter.

> E. *Running a warrant check during a welfare check is not investigating a crime.*

> "Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441.

Our cases have taken that casual description and used it as a litmus test, requiring all welfare checks to be "'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' [Citations omitted.]" *Messner*, 55 Kan. App. 2d at 631.

But only a criminal investigation beyond the scope of a welfare check constitutes a seizure, implicating the protections provided by the Fourth Amendment. *Rodriguez* clarifies that while ordinary precautions taken for officer safety during a traffic stop are permissible, precautions taken to facilitate "[o]n-scene investigation into other crimes" impermissibly detours from the traffic stop mission. 575 U.S. at 354, 356-57. Yet running a warrant check is not investigating other crimes.

Running a warrant check is different than the criminal investigation prohibited by *Cady* and *Rodriguez.* It serves a noncriminal purpose—to protect the safety of all persons involved. "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular."

*Rodriguez*, 575 U.S. at 357. Similarly, the safety interests of an officer in a welfare check are different in kind from an officer's attempt to investigate crime in general. "Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself." 575 U.S. at 356.

Running a warrant check is merely checking a public record, not investigating a person for a crime. Nothing about running a name for warrants involves detecting, investigating, or getting evidence relating to the violation of a criminal statute. Issuance of a warrant reflects that the crime has already been detected and investigated, and the evidence has already been acquired. Running a name for warrants is not "[o]n-scene investigation into other crimes" which impermissibly detours from the mission of a welfare check. 575 U.S. at 354, 356.

> "Outstanding warrants are a matter of public record, and checking for them is fast and easy with modern technology. Checking for outstanding warrants is very different from an officer asking a stopped individual to disclose the presence of weapons, drugs, or contraband that the officer otherwise would not be able to discover. It likewise is very different from an officer asking a stopped individual for consent to search their vehicle or person, in the hopes of finding evidence that the officer otherwise could not find. The fact that warrants are a matter of public record not only makes the nature of the police action (running a warrants check) different, but it creates a situation in which a stopped individual may reasonably *assume* that the officer is aware of an outstanding warrant and intends to arrest them, which is a more dangerous situation for the officer if the officer is actually unaware of the outstanding warrant." *State v. Civil*, 328 Or. App. 662, 673-74, 539 P.3d 317 (2023) (finding a reasonable relationship between the warrant check and the lawful purpose of the traffic stop), *rev. denied* 372 Or. 156 (2024).

Willard may have reasonably assumed that Officer Long was aware of her outstanding warrant and intended to arrest her, as evidenced by her telling her friend on the phone that she expected to go to jail, even before the officer ran her for warrants. That

is a "more dangerous situation for the officer if the officer is actually unaware of the outstanding warrant." *Civil*, 328 Or. App. at 673-74.

F.       *Subjective intentions are irrelevant in determining officer safety.*

The majority assumes that because no evidence shows that the firefighters or Officer Long intended to transport Willard anywhere, and no one testified that Willard posed a danger to anyone, the warrant check must have been a criminal investigation. But the cases the majority relies on do not hold that running a warrant check is necessarily a criminal investigation. To the contrary, a check for outstanding warrants pending against the driver is one of the routine tasks associated with a proper traffic stop. *Rodriguez*, 575 U.S. at 349, 354-55; *State v. Beck*, 320 Kan. 747, 750, 571 P.3d 537 (2025) ("An officer conducting a routine traffic stop typically may request the driver's license and the vehicle registration and run a computer check to verify that information and to look for outstanding warrants."); *State v. Morlock*, 289 Kan. 980, 985-86, 218 P.3d 801 (2009). A dog sniff, by contrast, is a measure aimed at "detect[ing] evidence of ordinary criminal wrongdoing." *Indianapolis v. Edmond*, 531 U.S. 32, 40-41, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000). So is questioning, unrelated to the stop. The officer here conducted no criminal investigation by running a warrant check or otherwise.

The majority errs by finding it material that no evidence shows that Willard posed a danger to anyone. Although testimony about the officer's practice of driving intoxicated people home was sufficient in *McKenna*, 57 Kan. App. 2d at 738, it is unnecessary to the officer safety analysis. The warrant check was done early during this welfare check, when a reasonable officer could have anticipated that Willard would need to be transported by ambulance to the hospital or driven by an officer to jail or elsewhere.

> "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978)

(emphasis added). The officer's subjective motivation is irrelevant." *Stuart*, 547 U.S. at 404.

The officer safety justification for running a warrant check recognized in *Rodriguez* and *McKenna* does not rely on the officer's subjective fear of the individual. In the context of officer safety, the Supreme Court of the United States relies on an objective view of the circumstances:

> "Subjective intentions rarely play a role in Fourth Amendment analysis. See *Whren v. United States*, 517 U.S. 806, 811-13, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). In the context of officer safety in particular, the Supreme Court has relied on an objective view of the circumstances. See, e.g., *Ohio v. Robinette*, 519 U.S. 33, 38, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (holding that objective circumstances during a traffic stop allow an officer to order a driver out of the car, 'subjective thoughts notwithstanding'). Similarly, the availability of a 'search incident to arrest' for officer safety does not depend on the subjective mindset of the arresting officer. *United States v. Robinson*, 414 U.S. 218, 236 & n. 7, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)." *United States v. Holt*, 264 F.3d 1215, 1225 (10th Cir. 2001), *holding modified by United States v. Stewart*, 473 F.3d 1265 (10th Cir. 2007).

Cf. *New York v. Quarles*, 467 U.S. 649, 655-56, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984) (applying a "public safety" exception to the *Miranda* requirement; finding that when police officers ask questions reasonably prompted by a concern for the public safety, the availability of that exception does not depend on the motivation of the individual officers involved). *Quarles* explained why the standard is not subjective:

> "[It] should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officers. Undoubtedly, most police officers . . . would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect." 467 U.S. at 656.

So, for example, in *Maryland v. Wilson*, 519 U.S. 408, 414, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997), the Court asked whether the circumstances were the "'kind of transaction'" that would pose a risk of harm to the police or others, citing *Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). *Summers* found:

"Although no special danger to the police [was] suggested by the evidence in this record," the kind of transaction "may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." 452 U.S. at 702-03.

*Holt* found:

"That one officer is braver (or more foolhardy) than another, and therefore not subjectively concerned for his or her safety, should not deprive that particular officer of a right to protect his or her safety. Even the brave officer should be allowed to minimize the ever-present risk of being attacked or killed." *Holt*, 264 F.3d at 1225-26 (holding that because of dangers inherent in all traffic stops, government's interest in officer safety outweighs a motorist's interest in not being asked about presence of loaded weapons, regardless of whether the officer subjectively fears the motorist).

Officer Long's acts throughout the welfare check were reasonable. His mission during this welfare check was largely to foster public safety. Running Willard's name for warrants served that purpose and did nothing to render his acts illegal.

G.      *No investigative detention occurred after the welfare check.*

The third part of the test provides that if the officer determines that the citizen does not need help, any acts beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment. *Ellis*, 311 Kan. at 930. This broad test is met here, as Officer Long took no investigatory acts after first responders determined that Willard

did not need help and ended the welfare check, unlike in the cases the majority relies on. Willard was never detained beyond the time it took the firefighters and EMS to check her health. No one did anything to extend the duration of the welfare check. Even assuming that Willard was seized, that seizure never transformed into an investigative detention. The call for warrants and the dispatcher's response to that call happened while firefighters or EMS were still actively checking Willard's welfare, without the officer's involvement.

This is a crucial distinction from the facts in *State v. Ellis*, where the officer took Ellis' driver's license and retained it *after* the welfare check had concluded to run it for warrants. The officer there unlawfully detained Ellis by keeping her driver's license, escorting her out of the restroom and out of the store, and by directing her to place calls for a ride. 311 Kan. at 930. *Ellis* held: "Our caselaw makes it clear that police may not lawfully *extend* a welfare check by running a warrant check on an individual who is the subject of the check unless some other circumstances support prolonging the check and converting it into a detention." (Emphasis added.) 311 Kan. at 932. No extension happened here. We cannot view the dicta in *Ellis* as answering a question that our courts have never decided—whether an officer may legally run a warrant check on the subject of a welfare check *during* a welfare check.

*Ellis* also said that "for an officer to go beyond a voluntary encounter or a public safety check and *detain a person for further investigation*," the officer needs reasonable suspicion of a crime. (Emphasis added.) 311 Kan. at 931. Officer Long conducted no investigation of a crime after discovering Willard's warrant. He simply continued monitoring the situation while firefighters and EMTs completed the welfare check. So it is immaterial that the officer lacked reasonable suspicion of a new crime.

Other cases are similarly distinguishable. In *State v. Manwarren*, 56 Kan. App. 2d 939, 948-49, 440 P.3d 606 (2019), we found that an illegal seizure occurred when Officer Rivers took Manwarren's identification card because, at that point, the welfare check was

39

complete, and the officer lacked reasonable suspicion to extend Manwarren's detention. Similarly, in *Messner*, the panel found the officer exceeded the scope of the public safety stop by detaining Messner while he took Messner's driver's license, returned to the patrol car, and ran a warrant check. 55 Kan. App. 2d at 636-37. Likewise, in *Gonzales*, the panel found the officer exceeded the scope of the public safety stop by beginning an investigation "by asking about the ownership of the truck and asking for the occupants' driver's licenses." 36 Kan. App. 2d at 456. So too, in *Grabauskas*, 33 Kan. App. 2d at 216-17, the panel found that the officers exceeded the scope of the community caretaking exception by arresting the defendants without probable cause. See also *Morales*, 52 Kan. App. 2d at 188 (seizing Morales after he prepared to drive his vehicle away was not a bona fide community caretaking function). Nothing like that happened here. Officer Long took no documents, asked no questions, and asserted no authority over Willard until he arrested her with probable cause.

Running a warrant check during this welfare check did not violate the Fourth Amendment. Officer Long's running of Willard's name for warrants was "reasonably related in scope to the circumstances which justified [any] interference in the first place." See *Terry*, 392 U.S. at 20. It was a commonsense inquiry, not an effort to obtain an arrest for any events that happened on the scene. It furnished no link in any chain of evidence that could lead to a conviction for another crime. It was not a pretext for some unrelated criminal investigation without legal grounds. The circumstances, viewed objectively, show that the officer's acts were aimed at resolving the welfare check safely, rather than investigating whether a new crime was occurring. See *Davis v. Washington*, 547 U.S. 813, 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) ("That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. See, e.g., *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 186, 124 S. Ct. 2451, 159 L. Ed. 2d 292 [2004]."). The voluntary interaction, the receipt of Willard's name from the

firefighter, and the running of a warrant check during the welfare check were reasonable.

The majority finds that when Willard refused to cooperate with firefighters and told them she needed no help, the officer had a duty to terminate the welfare check soon after he arrived, raising an issue neither party argued nor briefed. But even if we assume that this issue is properly before us, the test adopted in *Ellis* does not depend on the subjective view of the person being aided. An unconscious person, lying under a bridge in the evening, and being roused by strangers may not be thinking straight. Willard was initially in "[a]lmost in an agitated state" when firefighters woke her, and she told firefighters she lived right there, under the bridge. Yet she apparently did not reside there because soon after she said she lived there, she needed assistance to tell her friend how to get there. Then the officer ran her name for warrants. Under our precedent, it is only when "*the officer is assured* that the citizen is not in peril or is no longer in need of assistance" that a welfare stop must end and further investigatory acts constitute a seizure, triggering the Fourth Amendment. (Emphasis added.) *Ellis*, 311 Kan. at 930.

Here, EMTs arrived while firefighters were still engaged with Willard. Willard cooperated with the EMTs and they assisted in her medical care. Officer Long, who had no medical training, who had next to no interaction with Willard, and who remained 20 feet away from her throughout the encounter, reasonably had no assurance that Willard was no longer in need of assistance until the EMTs released her. By that time, the officer knew that Willard had an outstanding warrant and arrested her based on probable cause. This is distinguishable from our cases cited above, that found an illegal extension of the welfare check to conduct a criminal investigation. So on that issue that the parties did not brief or argue, I disagree with the majority.

*Conclusion*

41

The key to permissible police action during a welfare check is the reasonableness required by the Fourth Amendment. See *Cady*, 413 U.S. at 439 ("The ultimate standard set forth in the Fourth Amendment is reasonableness."); *State v. Neighbors*, 299 Kan. 234, 247-49, 328 P.3d 1081 (2014). Nothing is unreasonable about a police officer checking to see if a person has outstanding warrants when the officer is thrust into a lawful encounter like this public welfare check. Officer Long's act did not threaten to emasculate the protections of the Fourth Amendment. The majority fails to explain how running a warrant check on a person while engaged in a lawful encounter or legal seizure amounts to the type of misconduct that would require the extraordinary remedy of suppression of evidence. I would find that the State met its burden to prove by a preponderance of the evidence that any search and seizure was lawful, and I would affirm the district court.